UNITED STATES of America,
Plaintiff–Appellee,

v.

Francisco SANGINETO–MIRANDA, (87–5667); Luray Betts, (87–5668); Enrique Vargas, (87–5711); & Benjamin Nelson, (87–5712), Defendants–Appellants.

Nos. 87–5667, 87–5668, 87–5711 and 87–5712.

United States Court of Appeals, Sixth Circuit.

Argued March 22, 1988.

Decided Oct. 27, 1988.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Timothy R. DiScenza, Asst. U.S. Atty. (argued), for plaintiff-appellee.

Alan Lubin (argued), Memphis, Tenn. (Court-appointed), for defendants-appellants in No. 87–5712.

Donald L. Ferguson (argued), Coconut Grove, Fla., for defendants-appellants in No. 87–5667.

Robert M. Brannon, Jr. (argued), Memphis, Tenn. (Court-appointed), for defendants-appellants in No. 87–5668.

Michael W. Burnbaum (argued), Coral Gables, Fla., for defendants-appellants in No. 87–5711.

Before JONES, MILBURN and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

Francisco Sangineto–Miranda ("Sangineto"), Luray Betts and Enrique Vargas pled guilty pursuant to Rule 11(a)(2), Fed.R. Crim.P., to charges of conspiracy to possess cocaine with intent to distribute and conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. After a jury trial, Benjamin Nelson was convicted of the conspiracy charges and of one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1)

and 18 U.S.C. § 2. Finding no merit to the contentions raised on appeal, we affirm.

## I. FACTS

In early April 1986, Gregory Hamilton, a government informant, notified Sergeant Charles R. Swain of the Shelby County Sheriff's Department, Narcotics Unit, that Luray Betts was planning to furnish large quantities of cocaine in Memphis. Since his arrest in early 1986, Hamilton had proved to be a reliable informant, providing information on several occasions that led to seizures of cocaine. Hamilton and Swain began negotiating with Betts for the purchase of cocaine. According to Swain, "the discussion had been for thirteen kilograms of cocaine."

During the negotiations, Betts let it be known that his source for cocaine was a man from Florida named "Ben" who could provide any quantity of cocaine they requested. On April 28, 1986, Betts told Hamilton that "his man Ben" was coming into town. He would be picking Ben up at the airport, although the cocaine would be coming by another route.

That afternoon, Special Agent Richard Holmes of the Drug Enforcement Administration ("DEA"), who was stationed in Memphis, received a call from DEA agents in Atlanta, asking him to check out an individual named Ben Nelson who was scheduled to arrive in Memphis from Miami. Holmes testified that "this was a man from Miami [that he] suspected of some type of drug activity." Holmes knew little about Swain's local undercover operation. Special Agent Laurence Courtney was in charge of the Betts investigation for the DEA and coordinated the undercover operation with local officials.

Holmes went to the Memphis airport with several officers and stopped Nelson for questioning. Nelson was escorted to an airport office, where he and his luggage were searched. The search failed to reveal narcotics, but Holmes remained suspicious because hotel receipts found in Nelson's inside coat pocket indicated that he had frequently traveled outside the United States, particularly to the Caribbean. Holmes testified that Nelson was advised of his rights, agreed to answer questions, and was free to leave at any time. Betts, who had arrived at the airport to meet Nelson, was briefly questioned by police. Both men were released less than thirty minutes after Nelson's initial encounter with Holmes.

That evening, Hamilton told Sergeant Swain that he was negotiating a cocaine deal with Betts in an apartment on Pidgeon Perch Lane in Memphis.[1] Betts had insisted that the deal be consummated in the presence of Swain, who was posing as the "money man." The informant also told Swain that he had observed two kilograms of cocaine in the apartment. Hamilton relayed this message from a nearby telephone.

Based on Betts's prior criminal record, Swain decided, with Special Agent Courtney's concurrence, that it was too dangerous to continue the undercover operation in the apartment. He instructed Hamilton to get the exact address of the apartment and call him back. When Hamilton returned to Pidgeon Perch Lane, Betts was waiting outside, quite upset that the "money man" had not arrived. Betts went into Hamilton's car and they drove together to a public telephone to call Swain. Police officers converged on the telephone booth and arrested Betts.

Several officers on the arrest scene then went to the Pidgeon Perch apartment where Hamilton had observed two kilograms of cocaine. The officers decided to enter the residence and "secure" the premises to ensure that evidence would not be destroyed. This group included Special Agent Holmes, who had been enlisted by Courtney earlier that evening to assist in the Betts investigation. When Holmes entered the apartment, he was "shocked" to find the same "Ben Nelson" he had questioned earlier that day at the airport. Nelson was sitting on the couch when the officers entered. He was arrested and read his rights.

---

1. Betts was not the lessee of the apartment.

While the officers were "securing" the apartment, the telephone rang and DEA agent Cecil Sherman answered it. The caller asked for "Ben." Agent Holmes took the phone and, affecting a "black street slang dialect," identified himself as "Ben." According to Holmes, he was trying "to ascertain who was on the other end of the phone without [the caller] discovering that I was a law enforcement officer." By the accent on the line, he thought the male caller was "Hispanic." When the caller had difficulty communicating with Holmes, a second person with "a heavy Spanish accent" came on the line. The second caller was able to converse with Holmes in English.

During the conversation, Holmes indicated that he was "ready to do the deal," and the caller "insinuated that they had the package." [2] Believing this to be an agreement to deliver the cocaine for which Hamilton and Swain were negotiating, Holmes and the caller arranged a meeting at a 7–Eleven about ten minutes from the Pidgeon Perch apartment.

Holmes went immediately to the convenience store following the telephone conversation.[3] He was accompanied by a surveillance team, which included Sergeant Bobby Cox of the Memphis Police Department, and Carl Pike, a Tennessee park ranger. Both officers, having been at the Pidgeon Perch apartment when the telephone calls came in, knew they were looking for "Hispanic or Latin type people" who had agreed to deliver narcotics.

Holmes did not see any Hispanic people at the 7–Eleven. After waiting a few minutes, he decided to return to the Pidgeon Perch apartment in the hope of making further contact with the callers. Before leaving, he instructed Cox, Pike and a third officer in a second car to maintain their surveillance of the convenience store. Cox and Pike positioned themselves in a parking lot across the street in view of the outdoor public telephone.

After Holmes returned to the Pidgeon Perch apartment, the telephone rang and he spoke again with the "Hispanic" callers. According to Holmes, "they wanted to put the deal off until tomorrow morning. I advised them that I was going back home to Miami and I wasn't going to wait until the following day. They agreed to meet me again at the 7–Eleven." The DEA agent told the callers he would be right over to the convenience store.

Meanwhile, Cox and Pike were watching the 7–Eleven when they observed two individuals, who ultimately turned out to be appellants Vargas and Sangineto, walk to the outdoor public telephone. Cox testified that they "observed two subjects walk into the 7–Eleven store, which was at the place where the deal was supposed to go. They walked up to the phone, stood around the phone for a few minutes, kind of suspicious acting way, not particularly dialing the phone number, just standing there really. After a few minutes one of the guys did get on the phone." While the subject was on the telephone, Cox stated, they received a radio transmission that a second call had been received at the apartment and that "the subjects were back at the 7–Eleven ... wanting to do the deal." The officers were instructed to detain the callers if they attempted to leave the area.

Following the radio transmission, Pike moved in closer, as Cox pulled his unmarked car around the corner on the west side of the 7–Eleven. Pike heard Vargas and Sangineto speak in Spanish and relayed that information to Cox. When the officers concluded that Vargas and Sangineto were leaving the area, they moved in to stop the subjects. With guns drawn, Cox and Pike and a third officer arrested Vargas and Sangineto, handcuffed them, and put them in the police car. Neither defendant was advised of his rights under

---

**2.** Holmes testified that neither he nor the caller specifically mentioned cocaine or money.

**3.** Shortly thereafter, Sergeant Swain arrived with a search warrant, and the officers commenced a full search of the apartment. Swain had departed to secure the warrant shortly after Betts was arrested. The search team did not find the two kilograms of cocaine that Hamilton had seen earlier that day. Instead, the officers uncovered a small amount of cocaine, a pistol, several scales, and plastic bags.

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Cox asked the arrestees about their means of transportation to the convenience store, to which Sangineto replied he was in the "old truck" parked around the corner of the 7–Eleven.

A short time later, Holmes arrived at the convenience store. After briefly listening to Vargas and Sangineto speak, he concluded that they were the callers to the Pidgeon Perch apartment with whom he had spoken earlier. Holmes then effected what he characterized as an official arrest, and read them their rights in English and Spanish. According to the DEA agent, "[t]hey both acknowledged that they understood what I was saying."

Vargas and Sangineto were taken to where their truck was parked. Sangineto signed a consent form permitting the officers to search the truck. Holmes testified that he explained the form to Sangineto before signing, and the defendant acknowledged that he understood it. A search was conducted, but police were unable to find narcotics.

While the search was proceeding, Holmes and Pike walked Vargas and then Sangineto to several motels in the immediate area in an effort to locate their local accommodations. Both defendants had denied they were staying in the vicinity. When Holmes brought Sangineto to the Days Inn Motel, the night clerk did not recognize him, but was able to find a room registration card in the appellant's name.[4]

Sangineto was asked to sign a consent form to search the hotel room, although he was informed that he had a right to refuse. According to Holmes, "I asked him, you know, I have reason to believe that you are staying in the room, and I was going to subsequently contact the U.S. attorney and go through the process of trying to get a search warrant for the room, and he agreed to give me a consent search for the room." The consent form was explained to Sangineto, whereupon it was signed.

A security guard then opened room 239, and a search commenced. Both Vargas and Sangineto were present. The officers discovered six kilograms of cocaine in a closed trunk under the bed. Vargas and Sangineto were taken to police headquarters, and their truck was again searched. This time, three kilograms of cocaine were found.

On May 14, 1986, a grand jury returned a two-count indictment against Nelson, Betts, Vargas and Sangineto. Count one charged a conspiracy to possess cocaine with intent to distribute and conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count two charged possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Before trial, the defendants moved to suppress the evidence seized from the Pidgeon Perch apartment, Sangineto's truck and the room at the Days Inn Motel. These motions were denied. A jury trial was commenced on March 30, 1987, but the district court declared a mistrial the next day. Subsequently, Betts, Sangineto and Vargas entered guilty pleas on the conspiracy count, pursuant to Rule 11(a)(2), Fed.R. Crim.P., reserving their right to appeal from the denial of their pretrial motions to suppress. A new trial was held for Nelson. On April 7, 1987, he was convicted on both counts of the indictment.

## II. WARRANTLESS ARRESTS

Betts, Vargas and Sangineto argue that the police lacked probable cause to arrest them without a warrant. Betts faults the officers for failing to conduct an independent investigation of the information supplied by Hamilton, the government informant. Vargas and Sangineto, characterizing their arrest as "global and undifferentiating," contend that they were arrested merely because they were at the 7–Eleven, appeared to be of "Latin descent and spoke Spanish." They say that "[a]ny hispanic individual at the 7 Eleven Store would have

---

**4.** To assist the night clerk, Holmes produced Sangineto's identification, which had been con-

fiscated upon arrest.

been equally mistreated at the hands of officers who were ill-advised as to the identity of a suspect." (emphasis in original). Focusing on the telephone conversations received by Holmes at the Pidgeon Perch apartment, Vargas and Sangineto insist that the DEA agent made no reference to drugs and thus the conversation "could easily have been an innocent discussion between people not selling contraband."

■ A warrantless arrest is justified if, at the time of the defendant's arrest, police officers have probable cause to believe that an offense has been, is being, or will be committed. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Probable cause exists where the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979) (and cases cited therein). The probable cause requirement does "not demand any showing that such a belief is correct or more likely true than false." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983).

■ Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). *See also United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) ("The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain conmon-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers."); *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Thus, in determining whether probable cause exists, the trial court must look to the "totality of the circumstances,"

*Gates,* 462 U.S. at 230–31, 103 S.Ct. at 2328, and view the facts "as a whole and in a practical manner." *United States v. Pepple,* 707 F.2d 261, 263 (6th Cir.1983). We review the district court's finding of probable cause under the "clearly erroneous" standard. *Ibid.*

■ Applying the foregoing principles, we conclude that the police had probable cause to arrest Betts without a warrant. In early April, Hamilton, a reliable informant, had provided law enforcement officials with detailed information concerning Betts's efforts to furnish cocaine in Memphis. Much of this information was verified by police recordings of the informant's negotiations with the defendant. During these conversations, Betts indicated that his source for cocaine was a man from Florida named "Ben," who could provide any quantity they requested.

On April 28, 1986, Hamilton informed police that Betts would be meeting "his man Ben" at the airport, but the cocaine would be coming by another route. That evening, Hamilton and Betts began negotiating a cocaine deal in the apartment on Pidgeon Perch Lane. At that time, the informant observed two kilograms of cocaine in Betts's possession. *See United States v. Remy,* 658 F.Supp. 661, 667 (S.D. N.Y.1987) (probable cause existed where confidential informant was given a sample of cocaine in the apartment minutes before the arrest). Hamilton relayed this information to Sergeant Swain, and also advised that Betts was upset because the "money man" was not present to consummate the deal. Seeking to contact Swain, Hamilton and Betts then drove to a nearby public telephone, where Betts was arrested.

The district court concluded that

on April 28 at the time of his arrest Betts was engaged in a cocaine transaction to be completed that same night. Considering all the circumstances, there was ample probable cause for the arrest of defendant Betts. Clearly there were sufficient facts to convince a reasonable person that Betts was engaged in the commission of a crime.

The trial court's determination of probable cause is not clearly erroneous.

■ Alternatively, Betts contends that probable cause had existed for a sufficient period of time to allow the police to obtain a warrant for his arrest. We disagree. To be sure, the police knew in early April about Betts's possible involvement in criminal activity. However, it is unlikely they truly had probable cause until April 18, the date of arrest, when Hamilton notified Sergeant Swain that he was negotiating a cocaine deal with Betts and had observed two kilograms in the Pidgeon Perch apartment. We will not second-guess the officers in determining when probable cause arose. In any event, the officers "were conducting an ongoing investigation, and were not required to seek a warrant as soon as they had probable cause to suspect a conspiracy to distribute cocaine." *United States v. Palumbo*, 735 F.2d 1095, 1097 (8th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984). Instead, police officers reasonably could wait until they gathered additional evidence of the conspiracy or for further charges.

■ We also conclude that police had probable cause to arrest Vargas and Sangineto at the 7–Eleven. As noted, Betts had informed Hamilton and Sergeant Swain that his source for cocaine was a person named "Ben." When law enforcement officials, including DEA agent Holmes, entered the Pidgeon Perch apartment on April 28, they discovered Ben Nelson; this was the same "Ben Nelson" that Holmes had detained at the airport earlier that day on suspicion of drug trafficking. As the magistrate noted, "[t]he presence of Benjamin Nelson in the apartment fitted quite nicely with Luray Betts's statement that his source of cocaine was a man named Ben."

While the officers were "securing" the apartment, Holmes answered a call from a "Hispanic" person asking for "Ben." After some miscommunication, a second voice with a "heavy Spanish accent" came on the line, and Holmes indicated that he was "ready to do the deal." The caller insinuated that he had the package, and a meeting was scheduled for the 7–Eleven nearby. At this point, it was reasonable for Holmes to conclude that the two callers were involved in the narcotics transaction the police were investigating.

After Holmes returned from the 7–Eleven without meeting the callers, he received a second call from the "Hispanic" individuals. Meanwhile, Sergeant Cox and Pike, who were maintaining surveillance of the store, observed Vargas and Sangineto approach the public telephone and make a call. Both officers knew they were looking for "Hispanic or Latin type people" who had agreed to make a delivery of narcotics. While one subject was on the telephone, the officers received a radio transmission that a second call from the Spanish-speaking persons had been received at the apartment and that the subjects were waiting at the convenience store to do the deal. Pike approached the 7–Eleven and heard Sangineto and Vargas conversing in Spanish, confirming his identification of the callers. On the basis of these facts, Pike and Cox were justified in believing that Sangineto and Vargas were the persons even then engaged in a phone conversation concerning the cocaine transaction under investigation. The magistrate determined, and the district court agreed, that the arrest was based on probable cause. We affirm these findings of probable cause.

## III. WARRANTLESS ENTRY OF PIDGEON PERCH APARTMENT

Nelson and Betts seek to suppress all the evidence that was seized during the warrantless entry and "securing" of the Pidgeon Perch apartment, the telephone calls that DEA agent Holmes received while on the premises, and the items seized pursuant to the search warrant. They contend that the warrantless entry was not justified by exigent circumstances. The district court agreed with the magistrate that Nelson lacked standing to raise the fourth amendment issue. The district court also ruled that Betts had standing, but nevertheless concluded that the "[o]fficers were justified in securing the apartment to prevent destruction or removal of evidence by

**1510**

entering it prior to arrival of the search warrant."

## A. Standing

 We consider the issue of standing at the outset. A defendant has the burden of establishing his standing to challenge a search or seizure in violation of the fourth amendment. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978). The defendant must satisfy a two-part test: 1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and 2) whether society is prepared to recognize that expectation as legitimate. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).

 Both the district court and the magistrate correctly concluded that Nelson did not have a subjective expectation of privacy in the Pidgeon Perch apartment. At the suppression hearing, Nelson testified that Betts picked him up at the airport and both men proceeded to the latter's apartment. Because of the noise level there, they drove to the Pidgeon Perch apartment to transact some business. Nelson did not own or rent that apartment; nor did he have a key. Betts provided the means of entry. Although Nelson asserted that he intended to spend the night there and brought a shirt and pants, he left his red bag with the remainder of his clothing at Betts's residence. The magistrate did not find it credible that Nelson intended to stay in the apartment overnight. Moreover, there was no indication that Nelson had a right to exclude others from the apartment, nor was there any evidence that he took precautions to insure his privacy in any area of the apartment. When the police arrived, Nelson was sleeping on a couch in the living room. At best, the record indicates that Nelson was only a casual visitor. "A defendant's legitimate presence on the searched premises, without more, is insufficient to establish standing." *United States v. Antone*, 753 F.2d 1301, 1306 (5th Cir.) (citing *Rakas*, 439 U.S. at 142–43, 99 S.Ct. at 429–30), *cert. denied*, 474 U.S.

818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Nelson has not met his burden of establishing his standing to contest the warrantless entry. *United States v. Meyer*, 656 F.2d 979 (5th Cir.1981).

 The Government seeks a similar ruling with respect to Betts. It insists that Betts failed to show any expectation of privacy in the apartment or the ability to exclude others. We conclude, however, that Betts has met his burden of establishing a legitimate expectation of privacy in the Pidgeon Perch apartment.

Carl R. Glen, the lessee, testified that Betts had a key to the Pidgeon Perch apartment for about a year, and was afforded unrestricted access "just as any part of our family." The appellant was allowed to stay overnight "[a]s often as he felt," even without the lessee's knowledge or consent. Betts also kept clothes and other items in the apartment. Glen estimated that Betts remained overnight at least eight times within a one-month period.

For his part, Betts testified that he had gained access to the Pidgeon Perch apartment with his key "numerous times." He did so on April 28, the date of his arrest. Betts expected to exclude others from entering the apartment when he locked the front door from the inside, and he was never restricted from using the residence.

The Government did not contradict this evidence in any respect. The record thus reveals that Betts was more than a casual visitor or a mere transient. Rather, he enjoyed a legitimate expectation of privacy in the residence. Betts is entitled to challenge the warrantless entry of the apartment.

## B. Exigent Circumstances

Betts argues that the district court erred in concluding that there were exigent circumstances justifying the warrantless entry and "securing" of the apartment. He also seeks to suppress, *inter alia*, the telephone calls that Special Agent Holmes received while police were "securing" the

apartment.[5] The Government asserts that the warrantless entry was justified because the officers feared that Betts's failure to return would cause the occupants of the apartment to believe the police were on their trail, prompting them to destroy evidence. The Government also contends that Betts did not have a privacy interest in the telephone calls because he was not a party to the conversations; therefore, he cannot challenge their admission at trial.

**1**

The fourth amendment prohibits governmental intrusions into a private dwelling without a warrant supported by probable cause, subject only to a few carefully delineated exceptions. *Thompson v. Louisiana*, 469 U.S. 17, 19–20, 105 S.Ct. 409, 410–11, 83 L.Ed.2d 246 (1984). *See also Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971). In fact, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134–35, 32 L.Ed.2d 752 (1972). In view of this strong command, the Supreme Court has declared that searches and seizures inside a residence without a warrant are "presumptively unreasonable," *Payton v. New York*, 445 U.S. at 586, 100 S.Ct. at 1380, and the police bear a "heavy burden when attempting to demonstrate an urgent need" that might justify a warrantless entry. *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091,

2097–98, 80 L.Ed.2d 732 (1984). *See also United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir.1984) ("the burden is on the government to demonstrate exigency") (and cases cited therein), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).[6]

The Supreme Court has recognized only a few emergency circumstances excusing the need for a warrant. *See, e.g., United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978) (fire on premises, even if only smoldering). The Court has also made clear that the exigent-circumstances exception in the context of a home entry "should rarely be sanctioned when there is probable cause to be believe that only a minor offense ... has been committed." *Welsh v. Wisconsin*, 466 U.S. at 753, 104 S.Ct. at 2099.

This court has long recognized, along with many others, that exigent circumstances will be present when there is an urgent need to prevent evidence from being lost or destroyed. *See United States v. Adamo*, 742 F.2d 927, 948 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). *Accord, United States v. Johnson*, 802 F.2d 1459, 1462 (D.C.Cir. 1986). "This need may be particularly compelling where narcotics are involved, for 'narcotics can be easily and quickly destroyed while a search is progressing.'" *United States v. Socey*, 846 F.2d at 1444–

---

5. Nelson also seeks to suppress the telephone calls. Because Nelson does not have standing to challenge the warrantless entry into the Pidgeon Perch apartment, he also lacks standing to contest admission of the telephone conversations. *See United States v. Padin*, 787 F.2d 1071, 1076 (6th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986).

6. Exigent circumstances justify a warrantless entry into a home only where there is also probable cause to enter the residence. *United States v. Socey*, 846 F.2d 1439, 1444 n. 5 (D.C. Cir.1988); *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir.1988); *United States v. Howard*, 828 F.2d 552, 555 (9th Cir.1987); *United States v. Cresta*, 825 F.2d 538, 553 (1st Cir.1987).

45 (D.C.Cir.1988) (quoting *Johnson,* 802 F.2d at 1462).

When police officers seek to rely on this exception in justifying a warrantless entry, they must show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent. *Ibid.; United States v. Napue,* 834 F.2d 1311, 1326 (7th Cir.1987).

> The law is settled that a warrantless entry will be sustained when the circumstances then extant were such as to lead a person of reasonable caution to conclude that evidence of a federal crime would probably be found on the premises and also that such evidence would probably be destroyed within the time necessary to obtain a search warrant.

*United States v. Elkins,* 732 F.2d 1280, 1284 (6th Cir.1984). *Accord, United States v. Rivera,* 825 F.2d 152, 156 (7th Cir.), *cert. denied sub nom. Robles v. United States,* — U.S. —, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). This standard does not credit what the particular officers on the scene actually believed, if such beliefs would be unreasonable or unjustified in the situation. *Socey,* 846 F.2d at 1446.

### 2

*Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), provides considerable guidance in resolving the issue at bar. There, the Supreme Court ruled that an arrest outside the arrestee's home does not automatically justify a warrantless entry into the home on the assumption that evidence is likely to be destroyed. *Id.* at 35, 90 S.Ct. at 1972. Before exigent circumstances are present, the Court said, the police must have a reasonable basis for believing there is someone in the house who would likely destroy evidence. *Id.* at 34–35, 90 S.Ct. at 1971–72.

We believe, consistent with *Vale,* that a police officer can show an objectively reasonable belief that contraband is being, or will be, destroyed within a residence if he can demonstrate: 1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police

are on their trail, so that the destruction of evidence would be in order. *See Socey,* 846 F.2d at 1445 n. 6; *United States v. Aquino,* 836 F.2d 1268, 1273 (10th Cir.1988) ("The required release of these persons [suspected confederates] created the possibility that news of the arrests would reach others in the drug connection," thereby prompting the destruction of evidence); *United States v. Wulferdinger,* 782 F.2d 1473, 1476 (9th Cir.1986) (exigent circumstances justified warrantless entry where confederate's failure to return to premises, due to arrest, might cause those inside to dispose of evidence); *United States v. Moore,* 790 F.2d 13 (1st Cir.1986) (same).

### 3

We review the district court's legal conclusions under a *de novo* standard, *United States v. Andersson,* 813 F.2d 1450, 1455 (9th Cir.1987), but review its factual findings under the "clearly erroneous" standard. *United States v. Morgan,* 743 F.2d 1158, 1162 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). In judging the government's claim of exigent circumstances, the court must consider the totality of the circumstances, as well as the "inherent necessities of the situation at the time." *United States v. Rubin,* 474 F.2d 262, 268 (3d Cir.), *cert. denied sub nom. Agran v. United States,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed. 2d 68 (1973).

After carefully considering the record, we conclude that there were exigent circumstances justifying the warrantless entry into the Pidgeon Perch apartment. Specifically, we find that the officers on the scene at Betts's arrest had an objectively reasonable basis for concluding that the loss or destruction of evidence was imminent.

On the evening of April 28, police were told by Hamilton, their undercover informant, that Betts had cocaine in the Pidgeon Perch apartment and was ready to negotiate a deal with Sergeant Swain, who was posing as the "money man." At the suppression hearing, Swain testified that Hamilton had advised him by phone that he had

observed two kilograms of cocaine wrapped in a diaper-like material. Hamilton also told police officers that an individual named Ben Nelson was inside the apartment as well. As Courtney recalled, "What I knew at that time was that earlier in the evening the informant had been there, he had met with Mr. Betts and Mr. Nelson, that he had seen two of an alleged three kilograms of cocaine, that then more were supposed to be available for purchase, that Mr. Betts had left with the informant at a later time and Mr. Betts was in custody." Sergeant Swain testified that he was similarly informed of Nelson's presence in the apartment.

When Hamilton returned from speaking with Swain, he and Betts drove to a nearby public telephone, where Betts was arrested. Police officers at that time reasonably believed that Nelson was still in the Pidgeon Perch apartment; the same Ben Nelson that Special Agent Holmes had detained that very morning at the airport concerning drug trafficking. With this information in hand, police could reasonably believe that Betts's continued absence, while a search warrant was being secured, would alert Nelson that the police were on their trail, thereby prompting him to destroy narcotics.

"This is not a case where the police had ample time and opportunity to secure a search warrant, but decided to forego that option in the hope that exigent circumstances would arise." *Socey,* 846 F.2d at 1447. Sergeant Swain sought a warrant shortly after police had learned from Hamilton that Betts had in his possession several kilograms of cocaine to sell to the "money man." It is unlikely that the police had probable cause to secure a search warrant for the apartment any time earlier. We also emphasize that "the warrantless entry was limited in scope and proportionate to the exigency excusing the warrant requirement." *Id.* at 1448. The police did no more than "secure" the premises to ensure their safety and to prevent the loss or destruction of evidence. *See United States v. Elkins,* 732 F.2d 1280, 1285 (6th Cir. 1984).

Betts argues that the police lacked evidence that Nelson knew of Betts's arrest or the police surveillance. However, this impermissibly shifts "the inquiry from what the experienced officers reasonably believed, to what the suspect[ ] actually knew of the events outside the [apartment] and [his] reaction thereto." *Socey,* 846 F.2d at 1446. This is clearly improper. *Ibid.*

Betts also contends that police should have established surveillance outside the apartment until the search warrant arrived. Given, however, the police officers' reasonable fears, this would have risked the loss of evidence. As such, there was no need to pursue this course. *United States v. Allison,* 639 F.2d 792, 794 (D.C. Cir.1980).

Since the police had an objectively reasonable belief that the destruction of narcotics was imminent, they were justified in entering the Pidgeon Perch apartment without a warrant for the limited purpose of "securing" the premises and preventing the loss or destruction of evidence.

### 4

We also rule that Betts may not suppress the telephone conversations that occurred while the police were "securing" the apartment. *United States v. Passarella,* 788 F.2d 377 (6th Cir.1986), is controlling. In that case, police officers lawfully gained admission to Passarella's home and ascertained from those in the house that the suspect was expected to return shortly. While police were waiting, several calls came in. Special Agent Moulton answered the telephone and permitted the caller to assume that he was Passarella. "During the course of these calls, the caller, believing that Moulton was Passarella, talked about an opportunity for a major sale of dilaudids." *Id.* at 378. This incriminating evidence was eventually used against Passarella at his trial.

On appeal, Passarella challenged the admission of the conversations. He argued that Moulton violated his right of privacy under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.

§§ 2510–2520, and the fourth amendment to the Constitution. Both contentions were rejected. With respect to Title III, the court ruled that the Act was made "expressly inapplicable to consensual interceptions, such as those in the instant case." *Passarella*, 788 F.2d at 379 (citing 18 U.S.C. § 2511(2)(c)). On the fourth amendment issue, the court concluded that where the police are lawfully on the premises and answer the telephone, no expectation of privacy arises as to the conversations in which the defendant did not participate. *Ibid.*

Betts raises the same arguments in the case at bar. As in *Passarella*, they are without merit. Since the police were lawfully on the premises when Special Agent Holmes answered the telephone, Betts did not have an expectation of privacy in conversations in which he did not participate. Accordingly, the district court did not err in refusing to suppress these conversations.

 Betts argues that *Passarella* is distinguishable because, unlike the instant case, Special Agent Moulton did not affirmatively misrepresent his identity. He points out that Holmes misrepresented himself as "Ben," while affecting a "black street slang dialect." To be sure, Special Agent Moulton in *Passarella* did not make any affirmative misrepresentations, but "merely permitted the caller to assume that he was Passarella." *Id.* at 380. However, we also recognized that "a certain degree of deception or subterfuge on the part of law enforcement authorities" is a "necessary incident to the investigation of unlawful activities, which are, by their nature, covert and secretive." *Ibid.* (and cases cited therein). We concluded that the fourth amendment did not protect "a wrongdoer's misplaced trust;" nor did it "require the police to offer their true identity whenever they answer[ed] the telephone." *Ibid.* Similarly, we rule that Holmes's false identification does not require suppression of the calls as non-consensual, any more than any undercover agent's false identity requires suppression in similar circumstances.

## C. Betts's Remaining Contentions

 Betts's remaining two contentions require little discussion. He argues that the government failed to comply with Rule 41(a), Fed.R.Crim.P., which provides that a search warrant may be issued "upon request of a federal law enforcement officer or an attorney for the government." Betts insists that the record lacks any evidence that the request for the search warrant was made by a federal law enforcement officer or a government attorney. We disagree.

Although Sergeant Swain, a state officer, signed the affidavit in support of the search warrant, the warrant was issued to Laurence Courtney, a federal law enforcement officer. Moreover, the district court found that an Assistant United States Attorney accompanied Swain to the magistrate to obtain the warrant. This adequately satisfies the requirements of Rule 41(a). *See United States v. Carra*, 604 F.2d 1271, 1273 (10th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

Lastly, Betts contends that Swain's affidavit in support of the warrant contained false statements made knowingly or intentionally, or with reckless disregard for the truth. In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court ruled that a search warrant must be voided and the fruits of the search excluded if a defendant shows by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause. *Id.* at 155–56, 98 S.Ct. at 2676–77. The district court concluded that Betts failed to meet this standard, and we see no reason to disturb that ruling. Even assuming the presence of inaccurate information in the affidavit, the remaining portions are sufficient to base a finding of probable cause.

## IV. *MIRANDA* VIOLATION AND SUPPRESSION OF "FRUITS"

Sangineto raises two contentions concerning the failure of Sergeant Cox and

Ranger Pike to administer the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), following his arrest at the 7–Eleven. Initially, he argues that the cocaine seized from his truck is inadmissible as "fruit of the poisonous tree" because both were found only as a result of interrogation conducted without the benefit of *Miranda* warnings. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Sangineto also asks us to decide whether the initial failure to administer *Miranda* warnings "taints" his subsequent consent to search his truck and motel room, which occurred after he had been fully advised of his *Miranda* rights.[7]

At the outset, we reiterate briefly the critical facts that inform our analysis. While Special Agent Holmes traveled back to the Pidgeon Perch apartment to wait for the "Hispanic" callers to make further contact, Sergeant Cox and Ranger Pike watched the 7–Eleven. After the officers observed Sangineto and Vargas make a second telephone call, they concluded the suspects were leaving the convenience store; they moved in and arrested them. Cox and Pike failed to read either defendant the *Miranda* warnings. Subsequently, Cox asked the defendants about their means of transportation. Sangineto replied he was in the "old truck" parked around the corner of the 7–Eleven.

When Holmes arrived on the scene, he verified that Sangineto and Vargas were the callers to the Pidgeon Perch apartment. The DEA agent then effected what he characterized as an official arrest, and fully read them their rights in both English and Spanish. The defendants were driven to Sangineto's truck, where Sangineto signed a consent form permitting the officers to search the vehicle. The consent form had been explained to Sangineto before he signed. Later on, Sangineto signed a consent form to search his room at the Days Inn Motel. Police searched the room and found three kilograms of cocaine in a

trunk hidden under the bed. Cocaine was also eventually found in Sangineto's truck.

## A. Sangineto's Pre–*Miranda* Statements

 Sangineto argues that his pre-*Miranda* statement concerning the existence and whereabouts of his truck should have been suppressed. Additionally, he argues that, because only his answer enabled police to find his vehicle and the narcotics hidden inside, the cocaine should have been suppressed as "fruit of the poisonous tree."

The magistrate concluded that the questioning of Sangineto after his arrest but before the *Miranda* warnings were administered was "illegal, but the response that Mr. Sangineto made concerning the truck was not in itself an incriminating one." He further noted that "Sangineto does not claim that the question leading to the location of the truck invalidated the later consensual search." Sangineto took issue with both conclusions in filing objections to the magistrate's report. The district court adopted the magistrate's report and recommendation and affirmed in a brief order.

It is undisputed that Sangineto was in a custodial situation, which mandated *Miranda* warnings. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*Miranda* warnings are required where there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest). Those warnings were not administered until Holmes arrived on the scene. It is equally clear that Officer Cox's question concerning Sangineto's means of transportation constituted interrogation. *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987) (interrogation refers to direct questioning by law enforcement officers and "its functional equivalent"); *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (same). "When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates

---

**7.** Vargas joins Sangineto in these arguments. However, as the Government notes, "Vargas made no statements and gave no consents."

Moreover, he has no standing to object to Sangineto's statements or consents.

that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985). Indeed, this "bright-line rule" applies even if the pre-warning statements are voluntary. *Id.* at 304, 317, 105 S.Ct. at 1297. Thus, Sangineto's statement concerning the existence and whereabouts of his truck should have been suppressed.

We disagree with the lower court that Sangineto's statement was not incriminating. The statement enabled the police to locate the truck and eventually the cocaine hidden inside. It also served to connect Sangineto to the truck and the narcotics.

The more troublesome issue is whether the *Miranda* violation requires suppression of the narcotics found in the truck. We frame the issue as follows: whether nontestimonial physical evidence proximately derived from a *Miranda* violation is inadmissible as "fruit of the poisonous tree."[8] For the reasons discussed below, we conclude that the cocaine should not be suppressed.[9]

The Supreme Court in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), has charted the analytical course. In *Elstad*, police officers came to Elstad's house armed with an arrest warrant. Elstad, who was a suspect in a burglary of a neighbor's residence, made an incriminating statement to police without having been given the warnings required by *Miranda v. Arizona*. After Elstad was taken to police headquarters, he was advised of his *Miranda* rights. Elstad indicated that he understood his rights, but wished to speak to police. He then gave a written statement describing his involvement in the burglary.

Elstad was charged with first degree burglary. He moved to suppress his initial oral statement and the signed confession, arguing that "the statement he made in response to questioning at his house 'let the cat out of the bag' and tainted the subsequent confession as 'fruit of the poisonous tree,' citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." *Elstad*, 470 U.S. at 302, 105 S.Ct. at 1289 (citation omitted). The trial court excluded Elstad's first incriminating statement to police because he had not been given *Miranda* warnings, but admitted the written confession. Elstad was convicted, but the Oregon Court of Appeals reversed, holding that the confession should also have been excluded. The Oregon Supreme Court denied review.

The Supreme Court granted certiorari to decide "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Id.* at 303, 105 S.Ct. at 1290. The Court ruled that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. at 1297–1298.

In reaching this conclusion, the Court made several telling observations which have particular significance to the instant case. The Court first reiterated that the prophylactic *Miranda* warnings were not

---

**8.** The Supreme Court has not directly addressed this issue, although it has had an opportunity to do so. *See New York v. Quarles*, 467 U.S. 649, 660 n. 9, 104 S.Ct. 2626, 2633 n. 9, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974). Several members of the Court, however, have expressed a view on this issue. *Compare Quarles*, 467 U.S. at 660–75, 104 S.Ct. at 2633 (O'Connor, concurring in part, and dissenting in part), *with id.* at 688–90, 104 S.Ct. at 2648–50 (Marshall, J., with whom Brennan, J., and Stevens, J., join, dissenting). *See also Patterson v.*

*United States*, —— U.S. ——, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988) (White, J., with whom Brennan, J., joins, dissenting from the denial of certiorari).

**9.** The Government argues that the truck and the cocaine are admissible under the inevitable discovery rule. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Because the magistrate and the district court never made findings on this issue, we decline to rely on this basis.

directly compelled by the Constitution, but instead were measures to insure that the right against compulsory self-incrimination was protected. *Id.* at 305, 105 S.Ct. at 1291 (quoting *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984)). Thus, a police officer's failure to administer *Miranda* warnings did not necessarily mean there was a violation of the fifth amendment. " 'Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.' " *Ibid.* (quoting *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818–1819, 52 L.Ed.2d 238 (1977)).

In light of this, the Court explained the underlying reasoning supporting the long-standing prohibition against using pre-*Miranda* statements in the Government's case in chief.

> The *Miranda* exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.* Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Id.* 470 U.S. at 306–07, 105 S.Ct. at 1291–92 (citations and footnote omitted; emphasis in original).

The Court pointed out that the "Miranda presumption" of compulsion, although "irrebuttable" for purposes of the Government's case in chief, did "not require that the statements and their fruits be discarded as inherently tainted." *Id.* at 307, 105 S.Ct. at 1292. As an example, the Court cited *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), where the Court ruled that, although voluntary state-

ments taken in violation of *Miranda* could not be used in the Government's case in chief, the presumption of coercion did not bar their use for impeachment purposes on cross-examination. *Elstad,* 470 U.S. at 307, 105 S.Ct. at 1292. "Where an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, 'the primary criterion of admissibility [remains] the "old" due process voluntariness test.' " *Id.* at 307–08, 105 S.Ct. at 1292–93 (quoting Schulhofer, Confessions and the Court, 79 Mich. L.Rev. 865, 877 (1981)).

The *Elstad* Court also relied on *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). There, the Court was asked "to extend the *Wong Sun* fruits doctrine to suppress the testimony of a witness for the prosecution whose identity was discovered as a result of a statement taken from the accused without the benefit of full *Miranda* warnings." *Elstad,* 470 U.S. at 308, 105 S.Ct. at 1292–1293. Because the breach of *Miranda* procedures in *Tucker* did not involve actual compulsion, the Court concluded that the unwarned questioning did not abridge the defendant's constitutional privilege; it merely departed from the prophylactic standards of *Miranda. Ibid.* As the *Elstad* Court explained, "Since there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed." *Ibid.* Although the unwarned confession had to be suppressed, the third-party witness's testimony did not.

█ *Elstad* makes clear that a failure to administer *Miranda* warnings, without more, does not automatically require suppression of the "fruits" of the uncounseled statement. Where the uncounseled statement is voluntary, and thus not a product of "inherently coercive police tactics or methods offensive to due process," *id.* at 317, 105 S.Ct. at 1297, there is no fifth amendment violation and the "fruits" may be admissible in the Government's case in chief. *United States v. Bengivenga,* 845 F.2d 593 (5th Cir.1988) (en banc); *United*

*States v. Cherry,* 794 F.2d 201, 207–08 (5th Cir.1986); *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *United States v. Cherry,* 759 F.2d 1196, 1208–10 (5th Cir.1985). *See Elstad,* 470 U.S. at 308, 105 S.Ct. at 1292–93 ("We believe that [the] reasoning [of *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)] applies with equal force when the alleged 'fruit' of a noncoercive *Miranda* violation is neither a witness *nor an article of evidence* but the accused's own voluntary statement.") (emphasis added).[10] *Cf. United States v. Jones,* 846 F.2d 358 (6th Cir.1988) (where defendant's pre-*Miranda* statements are involuntary and coerced, the "fruit"—a gun—is inadmissible).

To be sure, the admission of nontestimonial physical evidence which is derived from a *Miranda* violation may marginally reduce the incentives to administer *Miranda's* prophylactic warnings. On the other hand, we believe "[t]he arguable benefits from excluding such [evidence] by way of possibly deterring police conduct that might compel admissions are ... far outweighed by the advantages of having relevant and probative [evidence], not obtained by actual coercion, available at criminal trials to aid in the pursuit of truth." *Michigan v. Tucker,* 417 U.S. at 462, 94 S.Ct. at 2373 (White, J., concurring). Whereas the goal of the fourth amendment's exclusionary rule is to deter unlawful police conduct, *Elstad,* 470 U.S. at 306, 105 S.Ct. at 1291, the goal of the fifth amendment's exclusionary rule is to assure trustworthy evidence. *United States v. Washington,* 431 U.S. 181, 187–88, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977); *Michigan v. Tucker,* 417 U.S. at 448, 94 S.Ct. at 2366. In the vast majority of cases, as in our case, there is plainly no reason to believe that nontestimonial physical evidence derived from uncounseled statements is untrustworthy.

■ There is an additional reason supporting admission of nontestimonial physical evidence derived from a *Miranda* violation. *Miranda* warnings, as we have noted, need only be given after a suspect is taken into "custody" or his freedom has otherwise been significantly restricted. In *Elstad,* the Court recognized that even the most diligent law enforcement official will have difficulty defining "custody" for purposes of administering *Miranda,* and thus we cannot expect police to act without error. *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293. The Court said, "If errors are made by law enforcement officers in administering *Miranda* procedures, they should not breed the same irremedial consequences as police infringement of the Fifth Amendment itself." *Ibid.* Consequently, where police simply fail to administer *Miranda* warnings, the admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment.

■ We conclude that the cocaine found in Sangineto's truck was admissible, even though knowledge of the existence and whereabouts of the truck were proximately derived from a *Miranda* violation. Sangineto does not claim that his statement concerning the truck was not voluntary, within the meaning of the Fifth Amendment. The record does not indicate otherwise. Indeed, the magistrate noted that "all the evidence is that Mr. Sangineto was extremely agreeable and cooperative throughout the evening, much more so than his co-defendant Vargas apparently wanted him to be." Whatever the reason for the officers' failure to administer *Miranda* warnings, "the incident had none of the earmarks of coercion." *Id.* 470 U.S. at 316, 105 S.Ct. at 1296–1297. Since there was no element of coercion present in this case, we see little reason to permit "highly

---

10. *See also United States v. Patterson,* 812 F.2d 1188, 1193 (9th Cir.1987) (pre-*Miranda* statements could be used in affidavit for search warrant to establish probable cause), *cert. denied,* — U.S. ——, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988); *United States v. Morales,* 788 F.2d 883, 885–87 (2d Cir.1986) (pre-*Miranda* statements could be used in determining probable cause to arrest).

probative evidence ... to be irretrievably lost to the factfinder." *Id.* at 312, 105 S.Ct. at 1294.[11]

## B. *Miranda* Violation and Sangineto's Consent to Search

██ We also reject Sangineto's contention that the earlier *Miranda* violation "taints" his consent to search the truck and the motel room. Sangineto signed the two consent forms after Holmes administered *Miranda* warnings in Spanish and English. As the Court stressed in *Elstad*, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded the admission of the earlier statement." *Id.* at 314, 105 S.Ct. at 1296. As in *Elstad*, the question here is whether the consent to search was made knowingly and voluntarily.

The magistrate examined "the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness" of Sangineto's consent to search his truck and motel room. *See id.* at 318, 105 S.Ct. at 1297–1298. In each case, the magistrate ruled that Sangineto had been fully informed of his rights, including his right to refuse the search, yet the defendant gave a knowing and voluntary consent to search. The magistrate also concluded that "all the evidence is that Mr. Sangineto understood English sufficiently well to communicate effectively in the language and read it." These findings are not clearly erroneous.[12] Accordingly, the *Miranda* violation in this case did not "taint" Sangineto's consent to search and the cocaine seized from the truck and the motel room were admissible.

## V. RACIALLY MOTIVATED JURY SELECTION

Relying on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Nelson argues that the Government violated his fifth amendment rights by using its peremptory challenges to exclude blacks from the petit jury. For the reasons discussed below, we find this argument to be without merit.

### A

In *Batson v. Kentucky*, the Supreme Court eased the burden of proving that the prosecution engaged in purposeful discrimination by exercising its peremptory challenges to strike blacks from the petit jury. The Court ruled that a defendant "may establish a prima facie case of purposeful discrimination in the selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 94–98, 106 S.Ct. at 1722–23. To establish a prima facie case, the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove members of his race from the venire. *Id.* at 96–98, 106 S.Ct. at 1723.[13] He then must show that "these facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.* at 96–98, 106 S.Ct. at 1723. If the defendant is able to show these factors are present in the impanelling of the petit jury, an inference of purposeful discrimination arises. *Ibid.*

The district court must examine all relevant circumstances in determining whether a prima facie case has been shown.

---

**11.** This is not a case where police continued their interrogation, despite a suspect's invocation of the rights to remain silent and to have counsel present. *Elstad*, 470 U.S. at 312–13 n. 5, 105 S.Ct. at 1294–95 n. 5.

**12.** Although Sangineto contends that he invoked his right to remain silent, the magistrate found otherwise. This finding is not clearly erroneous.

**13.** "[T]he defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892–93, 97 L.Ed. 1244 (1953)).

For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

*Ibid.* Although both the defense and the prosecution may have a great interest presenting their views on this issue, the trial court bears the ultimate responsibility for determining whether a prima facie case has been established. *See, Ibid.* ("We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.").

Once a defendant has made a prima facie case, "the burden shifts to the [prosecutor] to come forward with a neutral explanation for challenging black jurors." *Ibid.* In the instant case, however, the burden never shifted because the district court found that Nelson had failed to establish a prima facie case of purposeful discrimination. Where this burden-shifting step is never reached, the only issue for review is whether the district court erred in determining there was no prima facie case shown.

**B**

We have difficutly considering Nelson's contention because of his failure to establish a full record for intelligent appellate review. In order to meet the first two requirements of a prima facie case, we must know the race of the defendant, and whether the prosecutor has exercised a peremptory challenge to exclude at least one person of that race. However, it will be relevant to the third and crucial require-

ment of a prima facie case to know: 1) the racial composition of the initial group seated and the final jury panel sworn; 2) the number of peremptory strikes allowed each side; and 3) the race of those who were struck or excused from the jury panel throughout the *voir dire* (whether for cause or by a peremptory challenge), the order of strikes, and by whom they were exercised.[14] In an appropriate case, it may also be useful to consider evidence as to the percentage of the "cognizable racial group" in the jury pool, or the racial composition of the district wherein the jury pool is selected. *United States v. Clemons*, 843 F.2d 741, 748 n. 5 (3d Cir.1988).

■ The defendant has the burden of producing a record in support of a prima facie case of purposeful discrimination. The prosecutor may assist the defense in creating a record, as the Government did here, but is under no obligation to help establish a prima facie case. The district court must provide the defense some leeway to enable it to produce a proper record, but ultimately this is an issue committed to its sound discretion.

■ In reviewing the record, we are able to discern the following information. In the first trial held in this case, a jury was impanelled consisting of 8 whites and 4 blacks. After the district court conducted *voir dire*, the government exercised two challenges—against 1 white and 1 black juror. The defense exercised 7 challenges, all against whites. Subsequently, there were three more sets of strikes, but there is no record of the race of those excluded or of the racial composition of the final jurors chosen. Eventually, a mistrial was declared and the jury was dismissed.

Although we have considerably more information concerning the second trial, the information is not complete. The original panel of twelve potential jurors seated con-

---

**14.** It will also be helpful to know the district court's procedure in conducting *voir dire*. In the instant case, the district court conducted *voir dire* and incorporated questions submitted in advance by both the prosecution and counsel for the defendants. Thus, there was no occasion for "questions and statements during *voir*

*dire* examination," as contemplated by *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1723. In addition, no back striking was allowed; once counsel exercised strikes against a given panel, counsel could not subsequently exercise strikes against those jurors called originally and not stricken.

sisted of 7 blacks and 5 whites. Two jurors were excused for cause; two persons took their place. In the first round of strikes, 7 potential jurors were excused. The government struck 3 blacks; the defense struck 1 black and 3 whites. That left 3 blacks and 2 whites, all of whom were eventually sworn. Seven more persons were added to the panel to reach a full complement of twelve. The court conducted *voir dire* as to the seven.

In the second round of strikes, 5 of the 7 new jurors were excused. It is unclear how many of these 5 were excluded by the Government, although we do know that such strikes as it used were against blacks. After these 5 were excluded, the jury contained 5 blacks and 2 whites, which meant that 2 additional blacks were seated after the second round of strikes. These 2 blacks were eventually sworn. Five more persons were seated to reach a full complement of twelve, one of whom was subsequently replaced for cause.

In the third round, 2 more jurors were excluded, but the record does not reflect their race. However, the record does reflect that the jury then consisted of 7 blacks and 3 whites, which meant that of the 3 persons added after the third round of strikes, 2 were black and 1 was white. Two more persons were seated to reach a full complement of twelve, one of whom was replaced for cause.

In the fourth round, the 2 replacements were excluded. The Government struck 1 black. That left, as before, 7 blacks and 3 whites on the jury. Two more persons (race unknown) were again added, one of whom was struck in the fifth round. An additional person (race unknown) was seated, and he was acceptable to both sides, inasmuch as the sixth round of strikes did not produce any exclusions. An alternate was added, and she was not struck in the seventh, and final, round. Although the racial composition of the jury that was eventually sworn is not known, the record establishes that the final jury panel contained at least 7 blacks.

### C

Nelson, who is black, argues here, as he did unsuccessfully below, that all of the prosecutor's challenges in the second trial were against blacks. The district court concluded that Nelson failed to make a prima facie showing of purposeful discrimination. We agree. The only evidence that Nelson proffers in support of his prima facie case is the fact that all the Government's peremptory challenges were against blacks. Although the record supports this contention, standing alone it does not raise the necessary inference of purposeful discrimination. In reaching this conclusion, we emphasize the important role that the district court plays in making this assessment, and this court's deference to that finding. *See Batson,* 476 U.S. at 96–98, 106 S.Ct. at 1723.

■ We reject Nelson's underlying premise that an inference of intentional discrimination will *always* arise if, without more, there is a showing that the prosecution used all its peremptory challenges to exclude blacks. We reject such a per se rule, particularly because it does not take into account considerations that may be very relevant, including the percentage of the racial group in the district jury pool or original jury; the pattern of strikes exercised by the defense; the number of strikes available to the government; and the composition of the ultimate jury sworn.

The Supreme Court's mandate in *Batson* to consider all the facts and circumstances means that we cannot lay down clear rules as to the specific numbers or percentages that will constitute or refute a prima facie case. However, we can state a number of factors which tend to support or refute the inference of discrimination necessary to make a prima facie case. Our discussion of these factors assumes a case such as we have here, where the government's peremptory challenges have all (or mostly) been against members of a cognizable racial group to which the defendant belongs.

■ If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the

group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.

█ If there are minority members on the jury but the prosecutor did not use all its peremptory challenges, that would be a factor tending to refute discrimination. However, if all the prosecutor's challenges were used, that fact would point toward an inference of discrimination.

█ Moreover, if the defense did not display a pattern of strikes against non-minority members, that fact might support an inference of discrimination. Yet, if the defense has clearly engaged in a pattern of striking non-minority members, that might make an inference of discrimination arising from the prosecution's opposing strikes less tenable. As an extreme example, if the defense strikes all six whites from an original jury panel of six blacks and six whites, there is a lesser inference of discrimination from the fact that the prosecution's subsequent strikes fall solely on the six remaining blacks.[15]

Nelson failed to present information concerning these relevant factors, and much of this information cannot be gleaned from the record. Nevertheless, this information was within the purview of the able and experienced trial judge in this case, and we see no reason to overturn her judgment.

In assessing "all relevant circumstances," as directed by the Supreme Court, the district court found it significant that the jury which eventually was selected in the second trial consisted of a majority of blacks. To be sure, the inclusion of blacks on a jury will not always bar a prima facie case, especially where other facts and circumstances give rise to an inference of purposeful discrimination. As the Third Circuit has said,

> [W]e doubt the significance of including a single black on a panel if, at the same time, the government used most of its peremptory challenges (e.g., thirteen of sixteen) to strike blacks with backgrounds similar to white jurors ultimately selected. In that case, the mere presence of a single black on the jury would not necessarily prevent a finding of a prima facie case.

Clemons, 843 F.2d at 747. However, the facts and circumstances in the instant case reveal that the government accepted many blacks throughout the jury selection process, and ultimately accepted a jury with a majority of blacks. We thus cannot say the district court erred in concluding that Nelson failed to raise an inference of purposeful discrimination on the basis of race. United States v. Montgomery, 819 F.2d 847, 850–51 (8th Cir.1987); United States v. Dennis, 804 F.2d 1208, 1210–11 (11th Cir.1986), cert. denied, — U.S. —, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987).

Having considered the remaining contentions, and finding them without merit, we AFFIRM all the convictions.

NATHANIEL R. JONES, Circuit Judge, concurring.

While I fully concur in the majority opinion as to Parts I, II, III, IV–B, V–A, and V–B, my concurrence as to Parts IV–A and V–C is only as to the result.

In part IV–A, the majority places heavy reliance on the Supreme Court's decision in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In my view, the facts in the instant case are readily distinguishable from those in Elstad. In particular, whereas in Elstad the relevant pre-Miranda statements were made in the least coercive of custodial environments, the pre-Miranda statements in the instant case were made while the defendants were in handcuffs and sitting in the rear of a police car. Thus, while the majority comfortably concludes that the pre-Miranda questioning of Sangineto and Vargas "had

---

**15.** This, of course, will also be influenced by the specific mechanics of carrying out strikes. *See,* *supra,* note 14.

none of the earmarks of coercion," I concur as to this issue solely on the ground that Sangineto has not raised the issue of coercion.

Concerning Part V of the majority opinion, I agree that the defendants have failed to set forth a prima facie case of discriminatory jury selection under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986), but disagree with the majority's proffered list of *Batson* "indicators." In my view, this court should not now attempt to catalogue what may (or may not) be indicative of racially discriminatory jury selection, or to set forth a rigid test for making such determinations. At any rate, the majority's suppositions in this regard are merely obiter dictum because they are unnecessary to the resolution of this case.

MILBURN, Circuit Judge, concurring.

I concur in the majority's opinion; however, my concurrence as to Part IV.A is only as to the result.