41 F.3d 1507
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Andrew A. SIMS; Andy Sims Buick, Inc.; John F. Sims,
Plaintiffs-Counter-Defendants-Appellants,
v.
CITY OF BROADVIEW HEIGHTS; Leo H. Bender, Mayor of the City
of Broadview Heights; Nick Chrisopulos, Zoning
Inspector of the City of Broadview
Heights,
Defendants-Counter-
Plaintiffs-
Appellees.
 No. 93-3410.
 United States Court of Appeals, Sixth Circuit.
 Nov. 14, 1994.
 
 Before: WELLFORD, BOGGS, and SILER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Andrew Sims, Andy Sims Buick, Inc., and John Sims ("Sims") appeal from the district court's grant of summary judgment that dismissed their claims and granted declaratory judgment for the City of Broadview Heights, Ohio. They claim, under 42 U.S.C. Sec. 1983, that the city has deprived them of rights guaranteed by the First, Fifth, and Fourteenth Amendments to the United States Constitution because its ordinances sharply restrict their right to display certain advertisements and signs. The city contends that the ordinances are constitutionally permitted regulations that are motivated by legitimate quality-of-life considerations. For the reasons set forth below, we hold that the record is inadequate to determine this constitutional question, and we remand the matter for further proceedings.
 
 
 2
 * The City of Broadview Heights ("the city") is a municipal corporation organized under Article XVIII, sections 3 and 7, of the Ohio Constitution as a charter municipality with full powers of home rule. Leo Bender was the mayor in 1991, and Nick Chrisopulos was the city zoning inspector at that time. The city and the two officials were named as defendants in this action brought by Sims. Sims Buick is the only automobile dealership in Broadview Heights.[1] Andrew Sims is the dealership's founder and owner. John Sims, his son, is the executive manager and vice president. The defendants later filed cross claims.
 
 
 3
 On November 5, 1990, Broadview Heights enacted Ordinance 132-90, codified in chapter 1479 of the city's Codified Ordinances ("Codified Ordinances"), setting forth the city's sign regulations. The ordinance begins with a statement of legislative intent:
 
 
 4
 This chapter is established to control the type, design, size, location and maintenance of signs in order to ... promote and maintain high quality residential districts and attractive public facilities; ... [t]o control the design and size of all signs so that they will be harmonious with their surrounding areas; [t]o provide a safe environment by eliminating any conflict between advertising or identification signs and traffic control signs[,] which would be hazardous to the safety of the public; [t]o control temporary signs and prohibit undesirable impacts on property values and neighborhood character; and [i]n business districts, to provide for appropriate signs for advertising goods or services rendered in keeping with the type of establishment involved.
 
 
 5
 [T]he City has determined that, without adequate regulation and design standards, signs are a nuisance. The number of signs in Broadview Heights is excessive and is unduly distracting to motorists and pedestrians, creates a traffic hazard, and in some places reduces the effectiveness of signs needed to direct the public. As the appearance of the City is marred by the excessive number, oversized and poorly designed signs, both residential and business property values are adversely affected....
 
 
 6
 The signs of least value to the people of Broadview Heights are those which carry commercial messages other than the advertisement of any product, service, event, person, institution or business located on the premises where the sign is located....
 
 
 7
 Codified Ordinances Sec. 1479.01(a), (b). Based on these stated concerns, the regulations prohibit the display of virtually any sign in the city without a proper permit. Id. Sec. 1479.13(a). Under the Codified Ordinances, a sign is defined to include "any display, figure, painting, drawing, placard, poster or other device visible from a public way, which is designed, intended or used to convey a message or direct attention to a building, person, institution, organization, activity, place, object or product." Id. Sec. 1479.03 (emphasis added). Moreover, "[g]as-filled balloons, search lights, pennants or streamers for or associated with advertising purposes" are prohibited in all signs and displays within the city. Id. Sec. 1479.07(d) (emphasis added). However, "[d]isplay[s] of official public notices, the flag and an emblem or insignia of an official governmental body" are exempted from the city's sign ordinances. Id. Sec. 1479.18(b) (emphasis added). Signs should reflect the style of architecture of the premises, should have colors that are "compatible with the color of the building facade and other existing signs," and be compatible with signs on adjoining premises without competing for attention. Id. Sec. 1479.05(a). Furthermore, signs must be "fabricated on and of materials of good quality, good weathering and durability and complimentary to their building." Id. Sec. 1479.05(c).
 
 
 8
 These laws collide head-on with the advertising philosophy of Sims Buick. Like many other automobile dealerships, Sims had regularly used a number of different multi-colored streamer displays, in stylized configurations, as a vehicle to draw prospective customers to its sales lot, dating back to the time that it was first established in 1979.[2] For example, in early 1990, Sims displayed a "tent" made of blue or green streamers.
 
 
 9
 In January 1991, the United States undertook "Operation Desert Storm," the military effort to drive Iraqi occupation troops out of Kuwait. The national mood on the home front inspired Sims's publicity company, "Attention Grabbers by George" ("Attention Grabbers"), to create the streamer display that is at the center of this lawsuit. In March or April 1991, Sims removed the tent display and set up an array of streamers configured to depict the American flag.
 
 
 10
 Essentially, Sims secured the left and right ends of a series of wide red and white rectangular plastic strips, which the city calls "streamers," to utility poles standing along the sidewalk fronting the dealership lot. The wide, horizontal rectangular strips, alternating vertically between red and white, depicted the thirteen stripes of the American flag. However, the respective strips were not attached to the strips adjacent, above or below. Therefore, nearby observers could notice gaps of open space between each of the "stripes," especially during breezy or windy moments. The display also included seven horizontal blue plastic streamers on each "flag." Each blue streamer was approximately half the width of the red and white streamers, and each was apparently superimposed, one below the next, onto the left half of each of the top seven "stripes." This "extra touch" created the effect of the blue field that contains the fifty stars of the American flag. However, "Attention Grabbers" did not include any stars in these "blue fields." Nevertheless, because of the slight gaps between the horizontal streamers, an observer standing close by the display at night, looking into the blue-streamer field at an upward trajectory, could see "stars," though the exact number would depend more on weather conditions in the sky than on the state of the union. In addition to the seven evocative "Old Glory" streamer creations, the display included more than a dozen smaller but traditional American flags, each made of nylon, each flying from its own modest flagpole.
 
 
 11
 The city determined that the smaller, traditional nylon flags dotting the Buick sales lot were exempt, under Codified Ordinances section 1479.18(b), from the city's sign regulations. However, on April 10, 1991, Chrisopulos sent a formal notice giving Sims forty-five days to remove the huge, stylized plastic-streamer creations. Sims received the letter on or about April 12 and protested, claiming that the streamers comprised seven legitimate representations of the American flag. Therefore, the dealership insisted that the entire display created by "Attention Grabbers" should be exempt from the sign regulations. The city took no formal steps against Sims besides sending the letter of April 10. However, on May 31, just after the deadline that had been set in Chrisopulos's letter expired, Sims filed suit in federal district court.
 
 
 12
 In their action, plaintiffs sought equitable relief in the form of a declaratory judgment that the streamer creations constituted valid American flags, exempt from local zoning restriction under Codified Regulation section 1479.18(b).[3] Sims also sought a permanent injunction that would enjoin the city from enforcing the ordinance.[4] On June 20, Defendants counterclaimed for declaratory judgment, and on November 29, they moved for summary judgment. On March 10, 1993, the court granted Defendants' motion for summary judgment and further issued a declaratory judgment for the city. Finally, the court dismissed Sims's pendant state defamation claims without prejudice. Sims then brought this timely appeal.
 
 II
 
 13
 Governments may impose reasonable restrictions on the time, place, or manner of protected speech, as long as the restrictions (1) are not based on the content or subject matter of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communicating the information. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). The city of Broadview Heights maintains that its sign regulations are content-neutral, applying equally in all zoning districts, noncommercial as well as commercial, throughout the city. Sims characterizes the restrictions differently, noting that the pennant and streamer prohibitions are specifically aimed against advertisers, Codified Ordinances Sec. 1479.07(d), and specifically characterize off-site commercial messages as "signs of least value to the people of Broadview Heights." Id. Sec. 1479.01(b).
 
 
 14
 Even where speech restrictions are not content-neutral, the Court has permitted the regulation of certain forms of commercial speech. In Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557 (1980), the Court observed that "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." Id. at 562-63 (citation omitted).
 
 
 15
 The Court then laid out a four-part analysis to determine the validity of governmental restrictions on commercial speech: (1) The regulated commercial speech must concern lawful activity and not be misleading in order to qualify for First Amendment protection. A restriction on such protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) is not more extensive than necessary to achieve that interest. Id. at 566. The Court later explained that the fourth step is met when the restriction is a reasonable " 'fit' between the legislature's ends and the means chosen to accomplish those ends." Board of Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989) (quoting Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 (1986)). Thus, the "fit" need not be perfect but reasonably proportionate to the interest served.
 
 
 16
 Considerations regarding aesthetics and roadside safety can implicate substantial government interests. See, e.g., City of Cincinnati v. Discovery Network, Inc., 113 S.Ct. 1505 (1993) (city regulations of sidewalk newspaper racks); Metromedia, Inc. v. City of San Diego, 453 U.S. 490 (1981) (city regulations of off-site commercial billboard displays); Rzadkowolski v. Village of Lake Orion, 845 F.2d 653, 655 (6th Cir.1988) (village regulations of on-site signs). Recently, the Supreme Court again noted that signs can:
 
 
 17
 pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs--just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise.
 
 
 18
 City of Ladue v. Gilleo, 114 S.Ct. 2038, 2041 (1994). In Ladue, the Court held that a city could not prohibit residents from displaying signs from their own homes. In this case, we are presented with a different context that poses many of the same classic constitutional questions.
 
 III
 
 19
 We need not reach these constitutional issues, however, if the Sims display can be defined as "flags," because the city exempts flags from these regulations. Codified Ordinances Sec. 1479.18(b). Even if the fluttering and motion of the pennant and streamer is its bane, it may still be difficult to distinguish between a permitted display of fluttering nylon-cloth American flags and a prohibited display of red, white, and blue plastic strips configured to represent American flags. Both displays flap in the wind. Both look similar from a distance. Broadview Heights contends that the plastic-strip configuration is garish and distracting; it glitters almost to a silvery glow in the daylight, and it does not even have stars. However, because both the left and right ends of the streamers are bound to poles, it may well be that the stylized "attention grabbers" flutter less than do free-standing nylon flags.
 
 
 20
 The Broadview Heights sign regulations, although defining the word "sign" in a thorough manner, do not define the word "flag." In the absence of such a definition, the city points to the United States Code for the term's plain meaning:
 
 
 21
 The flag of the United States shall be thirteen horizontal stripes, alternate red and white; and the union of the flag shall be forty-eight stars, white in a blue field.
 
 
 22
 4 U.S.C. Sec. 1. A star is added for each state newly admitted into the Union after July 30, 1947. Id. Sec. 2. This definition is reiterated in Title 36 of the United States Code, in the context of the laws governing the display and use of the flag by civilians. 36 U.S.C. Sec. 173. Therefore, since the creations by "Attention Grabbers" do not have any stars in their blue field, the city concludes that those creations are not within the formal legal definition of an American flag[5] and are therefore not entitled to exemption.
 
 
 23
 Sims points to 4 U.S.C. Sec. 3, which broadly prohibits any commercial use or representation of the American flag in the District of Columbia. In that section's expanded definition:
 
 
 24
 The words "flag, standard, colors, or ensign" ... shall include any flag, standard, colors, ensign, or any picture or representation ... made of any substance or represented on any substance, of any size evidently purporting to be either of said flag, standard, colors, or ensign of the United States of America or a picture or a representation of either, upon which shall be shown the colors, the stars and the stripes, in any number of either thereof, or of any part or parts of either, by which the average person seeing the same without deliberation may believe the same to represent the flag, colors, standard, or ensign of the United States of America.
 
 
 25
 (Emphasis added.) Although the text of 4 U.S.C. Sec. 3 expressly indicates that its standards apply exclusively to the respect that should be accorded the American flag in the nation's capital, it does indicate that there may be a genuine issue as to whether the material in the Sims display constitutes a "flag." Similarly, Sims points to the definition used in the "Flag Protection Act of 1989,"[6] which prescribes penalties for "desecrating the flag":
 
 
 26
 As used in this section, the term "flag of the United States" means any flag of the United States, or any part thereof, made of any substance, of any size, in a form that is commonly displayed.
 
 
 27
 18 U.S.C. Sec. 700(b) (emphasis added). Sims argues that, although 4 U.S.C. Sec. 3 is limited exclusively to the District of Columbia, and although 18 U.S.C. Sec. 700(b) is unconstitutional and would apply only to mutilators and "desecrators" of the flag, those provisions prove that the term "flag" is susceptible to expanded definitions and meanings, depending on the context and the nature of the restrictions in question.
 
 IV
 
 28
 In its memorandum of opinion and order granting the city's motion for summary judgment, the district court stated:
 
 
 29
 The displays at issue here are unquestionably "streamers." They are also unquestionably intended to attract customers to plaintiffs' dealership, and were therefore erected for "advertising" purposes as that term is generally understood. Streamers erected for advertising purposes are prohibited in every zoning district in Broadview Heights, regardless of the shape or form in which the streamers are constructed. Consequently, the Court finds that the display is prohibited by Sec. 1479.07(d), even though the streamers were arranged in the shape of a flag.
 
 
 30
 (Emphasis added). However, the district court made no findings as to whether, having been "arranged in the shape of a flag," the displayed items come within the ordinance's definition of flags.
 
 
 31
 "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." Firestone v. Galbreath, 976 F.2d 279, 285 (6th Cir.1992) (citing Jean v. Nelson, 472 U.S. 846, 854 (1985)). "Deciding constitutional issues only after considering and rejecting every nonconstitutional ground for the decision is a 'fundamental rule of judicial restraint.' " Ibid. (quoting Three Affiliated Tribes of the Fort Berthold Reservation v. World Eng'g, 467 U.S. 138, 157 (1984)).
 
 
 32
 In this case, the city's position is that Sims has displayed streamers, not an American flag. By contrast, the plaintiffs claim that they have displayed in good faith a bona fide American flag, which would exempt the display from the city's sign ordinances. Codified Ordinances Sec. 1479.18(b). In the alternative, if the factfinder determines that the streamer display does not meet the requirements necessary to constitute a flag, Sims raises several constitutional challenges against the city's sign ordinances. The district court found that the display is comprised of streamers and held that the display is therefore illegal, "regardless of the shape or form in which the streamers are constructed," even if the streamer configuration is "arranged in the shape of a flag."
 
 
 33
 This court reviews a trial court's interpretations of law de novo. United States v. Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir.1988). Upon our review of the plain meaning of the pertinent city ordinances, especially Codified Ordinances Sec. 1479.18(b), we reverse the district court's decision and hold that the Sims streamer display would be exempt from the sign restrictions if it were found to constitute a flag. Thus, if the display constitutes a flag, this matter can be resolved without having to reach Sims's constitutional challenge. However, because the district court did not make findings of fact as to whether the Sims streamer display does indeed constitute a flag, we are presented with an insufficient record on appeal by which to determine this important question.
 
 V
 
 34
 Accordingly, we REVERSE the district court's decision to grant summary judgment to the city, and we REMAND the matter to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 Unfortunately for Sims, the Bigelow Chevrolet automobile dealership, though located only "down the street" from Sims, on Broadview Road on the other side of Sprague Road, is on the other side of the city line that divides Broadview Heights and the City of Parma. Thus, Bigelow is not bound by the sign restrictions that hamper its nearby competitor
 
 
 [2]
 Under the Codified Ordinances, Sims was permitted to continue displaying non-conforming signs that had been erected prior to November 5, 1990, the effective date of Chapter 1479. Id. Sec. 1479.15. However, once taken down, they could not be raised again. The display at issue in this case was erected after the effective date
 
 
 [3]
 Complaint for Preliminary and Permanent Injunction, Declaratory and Monetary Relief, p 41. In all, Sims asked the district court to make five separate determinations under the rubric of "declaratory relief": (1) that the city is barred, under the First and Fourteenth Amendments to the United States Constitution, from prohibiting the display of the American flag; (2) that any city ordinance prohibiting the display of the American flag "without reference to any breach of peace or public purpose" is an unlawful exercise of local police power; (3) that "the display of the U.S. flag in this factual circumstance [it being implied that the Sims display constitutes the American flag] is exempt from local zoning restriction under the statutory scheme" of the city's codified ordinances; (4) that the Sims display is exempt from the zoning ordinances, even if the display of American flags may be restricted, because it is "a pre-existing non-conforming use" under Ohio law; and (5) that "the use or display of pennants and/or streamers at the [Sims dealership] is a lawful use and exempt from the application of any zoning ordinance as a pre-existing non-conforming use."
 
 
 [4]
 Prayer for Relief, p 2. Sims also asked for compensatory and punitive damages for deprivation under color of law of the defendants' constitutional rights and for malicious and intentional defamation and injury to their reputations
 
 
 [5]
 The city also contends that the gaps between the alternating red and white stripes invalidate the display from being regarded as "flags." However, the statutory text, if read literally, only seems to require alternating horizontal red and white stripes, whether or not they have spaces between them
 
 
 [6]
 Pub.L. No. 101-131, Secs. 2, 3, 103 Stat. 777 (codified at 18 U.S.C. Sec. 700). Although the Act was declared unconstitutional by United States v. Eichman, 496 U.S. 310 (1990), Sims cites it solely for its definition of the flag, an issue not addressed by Eichman