66 F.3d 326
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joyce E. MINTER, Defendant-Appellant.
 No. 94-4094.
 United States Court of Appeals, Sixth Circuit.
 Sept. 8, 1995.
 
 Before: JONES, GUY, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendant, Joyce Minter, entered a conditional guilty plea to one count of conspiracy to distribute cocaine and one count of possessing a weapon in relation to drug trafficking activities. The defendant reserved the right to challenge the court's denial of her earlier-filed motions to suppress and now does so on appeal.
 
 
 2
 Defendant argues that her arrest was without probable cause and the cocaine seized incident to her arrest should have been suppressed. She also argues that the search warrant executed at her home on January 13, 1993, was based on an insufficient affidavit and was not issued by a neutral and detached magistrate judge.[1] Our review of the record convinces us the trial judge correctly denied the suppression motion and we affirm defendant's conviction.
 
 I.
 
 3
 On March 17, 1993, Minter and 18 other persons were indicted and charged with conspiracy to distribute cocaine. The indictments followed a lengthy investigation by the Carribbean Gang Drug Task Force, a cooperative police effort involving federal and local police agencies.
 
 
 4
 As part of the investigation, telephone wiretaps were judicially authorized, and one of the intercepted conversations linked Minter to the conspiracy. In a January 6, 1993, telephone conversation, Minter arranged to purchase from co-conspirator, Terry Bender, two kilograms of cocaine for $50,000. Based on this conversation, a search warrant was obtained for Bender's apartment, and was executed on January 13, 1993. Police confiscated from defendant's apartment $48,000 in currency, narcotics paraphernalia, and firearms. Minter was subsequently arrested.
 
 
 5
 After arrest and indictment, the defendant was admitted to bail. While on bond, she was again arrested on May 5, 1993, and found to be in possession of four ounces of crack cocaine. Defendant and one Jon Smith were subsequently indicted and charged with intent to distribute cocaine base.[2]
 
 
 6
 Prior to trial, defendant filed a motion to suppress the evidence seized in the January 13, 1993, search of her apartment as well as the evidence seized incident to her arrest on May 5, 1993. The motion was denied as was a subsequent motion for reconsideration heard before a different district judge.
 
 II.
 The January 13, 1993, Search
 
 7
 Defendant makes three challenges to the January 13, 1993, search warrant, all involving the affidavit.
 
 
 8
 Defendant first argues that the affidavit did not explicitly allege that the premises to be searched would contain evidence of a crime. We find this interpretation of the affidavit to be based on a much too narrow reading. The basis for the issuance of the warrant was Minter's being overheard arranging to purchase two kilograms of cocaine for $50,000. The affiant, a member of the drug task force, stated that in his experience "persons who traffic in illegal narcotics drugs will keep their cash assets close by their persons or at their personal residence for safekeeping." (App. 179; emphasis added.) Cash on hand to purchase cocaine would certainly qualify as "evidence of a crime."
 
 
 9
 Similarly, the affiant further stated that, "persons who traffic in illegal drugs frequently keep weapons, such as firearms, on or about their person for use...." (App. 180; emphasis added.) Here again a common-sensical reading of the affidavit, which we are bound to make, would indicate the officers expected to find firearms related to narcotics trafficking, which also would constitute evidence of a crime.
 
 
 10
 Minter next argues that the information in the affidavit was stale. We agree with the trial judge that the seven days that elapsed between the intercepted conversation and the execution of the search warrant did not render the warrant stale. It is significant in this regard that the supplier of the cocaine told Minter that he did not have the cocaine in his possession for immediate delivery.
 
 
 11
 Defendant's third argument is that the warrant affidavit contained hand-written language that had been interlineated. Minter speculates from this that the added language could have resulted from "coaching" by the magistrate judge and, if so, this would have destroyed her detachment and neutrality. Minter sought an evidentiary hearing on this issue, which was denied.
 
 
 12
 The defendant was unable to offer any evidence, other than sheer speculation, to substantiate a claim of improper action on the part of the issuing magistrate judge. Under such circumstances, the request for an evidentiary hearing was properly denied.[3]
 
 
 13
 To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.
 
 
 14
 Franks v. Delaware, 438 U.S. 154, 171 (1978).
 
 III.
 The May 5, 1993, Warrantless Arrest
 
 15
 Defendant contends that her warrantless arrest was without probable cause. We review a district court's finding of probable cause under a "clearly erroneous" standard. United States v. Sangineto-Miranda, 859 F.2d 1501, 1508 (6th Cir.1988).
 
 
 16
 The motion to suppress evidence seized incident to arrest was referred to a magistrate judge. After a hearing, the magistrate judge filed a report recommending that the motion to suppress be denied. Over the defendant's objections, the district judge adopted the magistrate judge's report and recommendation.
 
 
 17
 The circumstances surrounding Minter's May 5, 1993, arrest begin with the fact that at this point in time she was under indictment for a cocaine offense, so the authorities were already aware of her involvement in the narcotics trade. The magistrate judge made the following additional factual findings in his report, which we accept as true:
 
 
 18
 A confidential informant (CI) of known reliability ... later informed members of the Caribbean/Gang Task Force (hereafter Task Force), a combined federal and state governmental criminal investigating association, that Minter was known to be dealing in cocaine. Working with the Task Force, and pursuant to instructions from a member thereof, the CI arranged with Minter to purchase a quantity of crack cocaine from her, to be delivered by Minter at the CI's residence on May 5, 1993.
 
 
 19
 On the morning of May 5, 1993, the Task Force began surveilling Minter. She was observed driving from her apartment building in a gold Oldsmobile Toronado with a temporary Ohio license plate. She was followed to 13855 Superior Avenue, a large apartment building. She entered that building at 10:20 a.m. and remained therein for approximately two and one-half hours.
 
 
 20
 At approximately 12:45 p.m. she left that building and drove away in the Oldsmobile. Still under surveillance, she drove to the area near East 117th and Union Street in Cleveland, Ohio, picked up an individual, drove around the block, then dropped the individual off.
 
 
 21
 Minter next drove to the 9700 block of Orleans Street, Cleveland, Ohio, which was the location at which she was to meet the CI to complete the crack cocaine transaction. At 1:10 p.m., she was seen backing into a driveway across the street from the CI's residence. She remained in her car, parked in the driveway, for approximately six minutes. Nobody approached her car, nor did she leave the car. The Task Force agents had told the CI not to be present at his residence when Minter was expected.
 
 
 22
 After remaining in the driveway for approximately six minutes, Minter drove away. About one minute later, her car was stopped, and she was arrested by members of the Task Force.
 
 
 23
 Minter was searched incident to her arrest. In her brassiere four ounces of crack cocaine were found and seized. The CI had informed the members of the Task Force that during a previous purchase of crack cocaine made from Minter, she had secreted it in her brassiere.
 
 
 24
 (App. 17-18.)
 
 In Sangineto-Miranda we stated:
 
 25
 Probable cause is "a fluid concept--turnig on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). See also United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) ("The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers."); Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Thus, in determining whether probable cause exists, the trial court must look to the "totality of the circumstances," Gates, 462 U.S. at 230-31, 103 S.Ct. at 2328, and view the facts "as a whole and in a practical manner." United States v. Pepple, 707 F.2d 261, 263 (6th Cir.1983).
 
 
 26
 859 F.2d at 1508.
 
 
 27
 In this regard, the magistrate judge concluded:
 
 
 28
 At the time they arrested Minter in her Oldsmobile, the Task Force members, including the arresting agents, knew the following: (1) a CI, of known reliability, had identified Minter as a dealer in crack cocaine; (2) the CI had made a deal with Minter in which she would sell the CI some crack cocaine on May 5 at the CI's residence; (3) Minter was surveilled on May 5 and seen going to an apartment building for more than two hours, picking up and dropping off an unknown male under suspicious circumstances, and driving to the block where the CI resided; (4) Minter was seen backing her car into a driveway across from the CI's residence and waiting there for approximately six minutes; and (5) Minter was seen driving away from that location. Under these circumstances, the arresting Task Force members had probable cause to believe that Minter was in possession of crack cocaine which she intended to distribute.
 
 
 29
 (App. 20.) When we apply the Sangineto-Miranda test as well as review the magistrate judge's determination of probable cause under the "clearly erroneous" standard, we conclude that probable cause existed for the arrest. When a known narcotics dealer arranges to make a sale to a CI and then shows up at the exact time and place the sale is to be consummated, a reasonable police officer could assume she was in possession of narcotics with the intent to distribute. We note also that Minter offered nothing at the suppression hearing to otherwise explain her activities.
 
 
 30
 An attack is also made, however, on the manner in which the government established the conduct of the defendant, which established probable cause. The government called only one witness, FBI Agent Robert Fiatal.[4] Fiatal testified in pertinent part as follows:
 
 
 31
 Q. So what were your duties on May 5th relative to the receipt of this information? [The information from the CI that he had arranged to buy cocaine from Minter with the sale to take place at his residence.]
 
 
 32
 A. My duties along with two other individuals were to conduct a physical surveillance of the activities of Miss Minter prior to delivery of that crack cocaine.
 
 
 33
 Q. Who was conducting the surveillance along with yourself?
 
 
 34
 A. Myself, Special Agent Kenneth Riolo of the Federal Bureau of Investigation. Detective Michael Grady of the regional transit authorities police.
 
 
 35
 Q. Were any other agents participating in this investigation on May 5th?
 
 
 36
 A. There were other agents and officers of the Caribbean gang task force who were involved in the surveillance, but they were back near the vicinity of 97th and Orleans waiting the arrival of Miss Minter.
 
 
 37
 Q. Where did you first observe Joyce Minter on May 5th, 1993?
 
 
 38
 A. Leaving the parking lot of the apartment building located at 26241 Lake Shore Boulevard, Euclid, Ohio.
 
 
 39
 ....
 
 
 40
 Q. Now, can you tell the Court what Miss Minter was driving?
 
 
 41
 A. She was driving an Oldsmobile Toronado which was gold in color. And also bore a temporary Ohio license plate.
 
 
 42
 Q. Now, after you observed Miss Minter get into the gold Toronado, what did you observe her to do?
 
 
 43
 A. Well, initially, when she left that location, she seemed to be looking around quite a bit to observe....
 
 
 44
 ....
 
 
 45
 Q. As you followed Joyce Minter, where did you observe her to go?
 
 
 46
 A. She went from the apartment building on Lake Shore Boulevard to the Windsor Park Place Apartments which is located at 13855 Superior Avenue, East Cleveland, Ohio.
 
 
 47
 ....
 
 
 48
 Q. And after she arrived at the Windsor Park Place Apartments, what did you see her do?
 
 
 49
 A. She entered the apartment building.
 
 
 50
 Q. And what, if anything, did you do?
 
 
 51
 A. We waited and kept observing the parking lot and the Oldsmobile Toronado.
 
 
 52
 ....
 
 
 53
 Q. Approximately how long was she inside the apartment building?
 
 
 54
 A. It was almost two and a half hours.
 
 
 55
 Q. When was it that you next saw Joyce Minter?
 
 
 56
 A. I think it was 12:45 p.m. in the afternoon Miss Minter left the apartment building and drove out of the parking lot again in the gold Oldsmobile Toronado with the temporary Ohio license [plate].
 
 
 57
 ....
 
 
 58
 Q. And where did you follow Miss Minter and the gold Toronado?
 
 
 59
 A. She proceeded south towards the vicinity of this Chagrin Boulevard and eventually, while she was heading east on Union, turned south on East 117th Street in Cleveland.
 
 
 60
 Q. Did you observe anything unusual as she reached the vicinity of 117th Street and Union Avenue in Cleveland, Ohio?
 
 
 61
 A. Yes, just a few doors south of Union Avenue on East 117th, Miss Minter stopped and picked up what appeared to be a black male. She then continued to drive completely around the block and went back to the same location where she picked that black male up and left that person off.
 
 
 62
 Q. Again, based on your training and experience, do you have an opinion as to what the activity was, or what, if any, activities was conducted in the car.
 
 
 63
 ....
 
 
 64
 A. Based upon my training, my observations as well as my knowledge of that particular area, of Cleveland, Ohio, it was my opinion that Miss Minter was delivering drugs to that individual that she picked up and drove around the block.
 
 
 65
 Q. After she dropped off this individual, what next did you observe Miss Minter do?
 
 
 66
 A. Miss Minter started heading, once again, in an easterly direction. When she came to the vicinity of 98th and Orleans, I stopped my surveillance of her because I knew that other agents and officers were in that vicinity.
 
 
 67
 ....
 
 
 68
 Q. While you were in your vehicle in the vicinity of 98th and Orleans, did you hear any other officers state over the radio what their observations were?
 
 
 69
 A. Yes. The other officers who had took over the surveillance because of their positions in that neighborhood observed Miss Minter back into a driveway located in the 9700 block of Orleans Avenue in Cleveland, Ohio.
 
 
 70
 Q. And where was this driveway in relationship to the place where Miss Minter was to distribute drugs to the cooperating individual?
 
 
 71
 A. It was located directly across the street.
 
 
 72
 Q. And what happened, or what did Miss Minter do after she pulled into the driveway across the street on Orleans?
 
 
 73
 A. She stayed there approximately five minutes.
 
 
 74
 Q. Now, going back for a moment, were any instructions given to the confidential source relative to his activities on May 5th, 1993?
 
 
 75
 A. The confidential informant was told by officers of the task force to not be at home when Miss Minter made the delivery of the crack cocaine.
 
 
 76
 ....
 
 
 77
 Q. I take it then there came a time when she left?
 
 
 78
 A. Yes, after staying in the driveway for about five minutes, she pulled out, drove in an easterly direction and was thereafter stopped and arrested near the intersection of East 98th Street and Benham Street in Cleveland, Ohio.
 
 
 79
 (App. 220-26.)
 
 
 80
 Cross-examination brought out the fact that Fiatal did not know the CI or talk to him, and that he was not present during the time Minter was parked in the driveway nor was he present at the time of her arrest and subsequent search. Defendant thus argues that much of Fiatal's testimony was hearsay.
 
 
 81
 Although, as defendant contends, it is true that part of Fiatal's testimony was hearsay, this does not make it either inadmissible or unreliable. Rule 104(a) of the Federal Rules of Evidence provides that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court," and "[i]n making its determination it is not bound by the rules of evidence...." See also United States v. Killebrew, 594 F.2d 1103, 1105 (6th Cir.), cert. denied, 442 U.S. 933 (1979) (in a suppression hearing held for the purpose of determining if probable cause existed for the arrest, hearsay testimony is admissible). Thus, the magistrate judge properly received and credited Fiatal's testimony.
 
 
 82
 AFFIRMED.
 
 
 
 [1]
 Defendant also challenges the May 5, 1993, search of an apartment, which she did not own or rent, and in which she did not reside. The government argues that she has no standing to challenge this search. The magistrate judge believed there was no need to discuss standing, however, because the leasor of the apartment was Minter's codefendant and also challenged the search. Although we find a question exists as to whether Minter has standing, since we agree with the magistrate judge that probable cause existed to support the issuance of the search warrant, we do not address the standing issue
 
 
 [2]
 The two indictments against Minter were later consolidated into one superseding indictment, to which defendant offered her conditional guilty plea
 
 
 [3]
 To the degree that the defendant argues that the warrant affidavit, even with the interlineation, did not establish probable cause, we reject this contention
 
 
 [4]
 At the time of this hearing, the superseding indictment had come down and the two named defendants were Joyce Minter and Jon Smith. The defendants both sought suppression of evidence and a joint hearing was held in which counsel for both defendants participated