JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Brian King appeals the trial court's overruling his motion to suppress the search of his apartment. After the court overruled the motion to suppress, defendant pleaded no contest and was found guilty of violating R.C. 2925.11, possession of crack cocaine in an amount of less than one gram.
 {¶ 2} Defendant's apartment was in the rear of a four-family home which the police had under surveillance as a suspected crack house. The detective who "staked-out" the house testified that defendant had numerous visitors late at night who would come, stay for two to ten minutes, and then leave. After determining that this activity was consistent with a crack house, the detective radioed the other members of the vice squad who followed a car after it left the suspected crack house, pulled it over, and questioned its occupants. Finding a crack pipe with residue on the male passenger in the car, but nothing on the woman driving the car, the police put them into separate police cars for questioning. The man and woman in the car are brother and sister.
 {¶ 3} The brother, who is also a nephew of defendant, told the police that he had gone to his uncle's home to buy crack. The woman, who is the niece of defendant and knew nothing of the crack deal, had remained in the car when her brother went inside.
 {¶ 4} After the police arrested the nephew, they took him and the niece back to their uncle's apartment and had them knock on the door and identify themselves. When defendant opened the door, the police entered the threshold into the kitchen. Then one detective guided defendant into the living room, where he informed defendant he wanted to search the house. The detective told defendant that defendant could either sign a consent form or wait with an officer in the house until the police obtained a search warrant.
 {¶ 5} Defendant signed the consent form, after which the police searched the apartment and found a rock of crack on the coffee table. They arrested defendant and let the niece go.
 {¶ 6} At the suppression hearing, two detectives testified, but only one testified regarding the entry into the house. He stated that the niece willingly cooperated with the police when she returned to the apartment to help them get defendant to open the door to them. Explaining why he had the niece and nephew knock on the door and identify themselves to defendant, he stated: "We felt if we tricked maybe, if you want to use the word, have the occupants come to the door, then we could identify ourselves and our premise, then make them aware why we were there." Tr. at 52. He stated he was afraid that if defendant knew it was the police at the door, he would destroy any evidence in the apartment. He admitted on cross-examination that he "figured, you know, that we'd have her knock on the door." When defense counsel asked, "When he opened the door, you guys would step in. That's exactly what happened; right?" The detective responded, "Yes, basically." Tr. at 71.
 {¶ 7} The detective also testified that defendant did not object when they walked into the house and that defendant willingly signed the consent form. Upon answering the door, defendant "looked somewhat startled because he then realized that besides the female that was there, the police were there —." Tr. at 54. He said that after defendant opened the door, he and the other two detectives with him stepped into the "area of the door that leads into the kitchen." Tr. at 72. He then proceeded with defendant into the living room because he noticed a man lying on the couch and was concerned that the man might be armed. He admitted on cross-examination that he did not have express permission to be in the house but stated, "I felt that he didn't object to us being there." Tr. at 74. In the living room, while keeping an eye on the man on the couch, the detective told defendant that he had arrested his nephew and his niece was with them and that he had a consent form, which he explained. He also told defendant, "we can stop at any time. * * * What we're going to do is leave someone here and go back and get a search warrant." Tr. at 59. At that point, the detective testified, defendant agreed to sign the consent form.
 {¶ 8} A search of defendant revealed he had a crack pipe on him. Additionally, the detective testified, "there was a rock of crack cocaine found right there on the table. There was a small rectangular table * * * by the couch there and there was a rock of crack cocaine found there." Tr. at 65. On cross-examination, the detective admitted that as he "walked into the house initially, through the kitchen, through the living room * * *," he was looking around. He denied, however, that the search actually began prior to defendant's signing the consent form.
 {¶ 9} The niece was the only witness for the defense. She testified that she did not feel that she could refuse to go with the police back to her uncle's apartment to help them gain access. She also stated that once her uncle opened the door, the police pushed in ahead of her and her brother, immediately searched and handcuffed defendant, and searched the house. She did not see defendant sign the consent form until after the search, when he signed the inventory of the house.
 {¶ 10} The niece also stated that the police were rude, calling her and the others "white trash." She admitted that because she was upset and frightened, she does not remember much of what happened after defendant opened the door. She consistently stated, however, that the situation was chaotic after defendant opened the door, that he was handcuffed immediately upon the police's entry into the apartment, and that defendant did not invite the police in. She said it did not appear that defendant had any choice in letting the police into the house.
 {¶ 11} The trial court found that the state had proven by clear and convincing evidence that defendant voluntarily signed the consent form prior to the search. Defendant timely appealed.
 {¶ 12} Defendant states one assignment of error:
 {¶ 13} "Where the record of suppression hearing reflects that at least three police officers, without warrant and without invitation, simply entered defendant's residence and began looking around, when defendant opened the door, and admitted as much, the state has failed to show by clear and convincing evidence that defendant's subsequent signing of a consent to search was freely and voluntarily made and defendant's motion to suppress evidence found therein, should have been granted."
 {¶ 14} Defendant argues that because the police were already in his house looking around before they presented him with the consent form, his consent was not voluntary. Additionally, he claims that because the police told him that if he refused to sign the consent, they would stay there until they could obtain a search warrant, the consent was signed under duress. The first question we must address, therefore, is whether the police entry into the home was lawful.
 {¶ 15} The United States Supreme Court held in State v. Payton
(1980), 445 U.S. 573, 589-590: "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambigousphysical dimensions of an individual's home — a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their * * * houses * * * shall not be violated." That language unequivocally establishes the proposition that "[at] the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."Silverman v. United States, 365 U.S. 505, 511. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.
 {¶ 16} The courts have, however, made exceptions to this rule for exigent circumstances. "In State v. Bowe (1988), 52 Ohio App.3d 112,113-114, 557 N.E.2d 139, 140-142, the court noted the four exceptions to the warrant requirement which justify a warrantless search of a home: (1) an emergency situation, (2) search incident to an arrest, (3) "hot pursuit" and (4) easily destroyed or removed evidence." State v. Cheers
(1992), 79 Ohio App.3d 322, 325, emphasis added.
 {¶ 17} In the case at bar, the court was presented with easily destroyed evidence. "When police officers seek to rely on thedestruction of evidence exception in justifying a warrantless entry, they must show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." State v. Baker and Bakey, 1991 Ohio App. LEXIS 1855 (April 25, 1991), Cuyahoga App. Nos. 60352, 60353, citingUnited States v. Sangineto-Miranda (6th Cir. 1988), 859 F.2d 1501, 1512. "A police officer can show an objectively reasonable belief that contraband is being, or will be, destroyed within a residence if he or she can demonstrate: 1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail so that the destruction of evidence would be in order." Id. North Royalton v. Bramente (April 29, 1999), Cuyahoga App. No. 74019. The detective testified that he was concerned that if he waited to obtain a warrant, defendant might be alerted to their presence before he could execute it. Certainly the niece or the nephew could have alerted defendant, who could have removed the evidence.
 {¶ 18} The Ohio Supreme Court has held that: "Pursuant to Section14, Article I of the Ohio Constitution, and in the absence of any judicially recognized exception to the warrant requirement, government officers are not privileged to deceptively gain entry into the private home or office of another without a warrant, where such home or office is not a commercial center of criminal activity, and where the invitation to enter the private home or office was not extended by the occupant for the purpose of conducting illegal activities." (Gouled v. United States
[1921], 255 U.S. 298; and Lewis v. United States [1966], 385 U.S. 206, followed.) State v. Pi Kappa Alpha Fraternity (1986), 23 Ohio St.3d 141, syllabus. In the case at bar, however, defendant's home was believed to be a commercial center of criminal activity: it was a suspected crack house. The situation in the case at bar is the exact circumstance anticipated by the exigent circumstances doctrine.
 {¶ 19} The police entry, therefore, although obtained by deception, was not unlawful. The nephew's statement, along with the residue of crack found on him, established a reasonable suspicion the house was a center of illegal commercial activity. Those exigent circumstances permitted a warrantless entry to prevent destruction of evidence. The police could have simply waited for the warrant once they secured the premises, therefore, without requesting defendant's consent.Pi Kappa Alpha, supra. The nature of defendant's consent, therefore, does not taint the evidence discovered in the search. The end result would have been the same. It merely would have taken longer because the police could have waited in the house while they obtained the warrant.
 {¶ 20} The trial court did not err in denying defendant's motion to suppress the evidence obtained in the search of the house. This assignment of error is without merit and the trial court is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, A.J., concurs in judgment only; MICHAEL J. CORRIGAN, J., concurs.