NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0205n.06
Filed: March 22, 2005

No. 04-5492

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee,* | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| ROBERT KEITH ELLIS, | ) | |
| | ) | **O P I N I O N** |
| *Defendant-Appellant.* | ) | |

BEFORE:    MARTIN and GILMAN, Circuit Judges; and COHN, District Judge[*]

**AVERN COHN, District Judge.**  This is a criminal case.  Defendant-Appellant Robert Keith Ellis (Ellis) appeals the district court's denial of his pre-trial motions to suppress tangible evidence and incriminating statements that were used against him at trial.  Ellis claims that (1) law enforcement officers did not have probable cause to enter the residence where Ellis was staying; (2) the officers violated 18 U.S.C. § 3109 by failing to announce their presence and the purpose of their visit; and (3) Ellis was given warnings violative of *Miranda v. Arizona*, 384 U.S. 436 (1966).  We affirm.

_____

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

# I. FACTUAL BACKGROUND

On December 20, 2002, a Kentucky indictment warrant for Ellis's arrest was issued for the offense of manufacturing methamphetamine. On January 27, 2003, Laurel County, Kentucky, Sheriff's Detective Richard Dalrymple (Dalrymple) received information from the Kentucky Department of Public Safety that it had received a complaint earlier that day that Ellis was staying at 1867 Lily Road and was manufacturing methamphetamine in the residence.[1] Dalrymple contacted Kentucky State Police Detective Jason O'Bannon (O'Bannon) and learned of the outstanding arrest warrant.

Later that day, Dalrymple, O'Bannon, two uniformed officers, and two federal officers set up surveillance outside the Lily Road address, which was a trailer home. O'Bannon testified that he received information from Dalrymple that Ellis was going to participate in a drug transaction; however, Dalrymple testified that the officers were not at the residence to see if someone came to purchase drugs. Dalrymple testified that the purpose of the surveillance was "to see if Mr. Ellis came in or out of the residence" because the officers "were going to serve an indictment warrant."[2] The officers observed a vehicle in the driveway of the Lily Road address. The vehicle was registered to a female with the last name of Ellis.

---

[1] Ellis characterizes the complaint as an anonymous complaint. The record, however, is devoid of evidence that tells whether the complaint was indeed anonymous.

[2] It is undisputed that the address listed on the arrest warrant was not the Lily Road address.

2

After approximately an hour of surveillance, Dalrymple and O'Bannon approached the front door of the trailer. The two federal agents approached the back door. Dalrymple testified that O'Bannon knocked on the front door three times and announced themselves as police officers after each knock. Dalrymple testified that O'Bannon waited a few seconds between each knock before knocking again. O'Bannon testified that he knocked "a couple times" on the front door and "yelled state police a couple times." The officers received no response after the knocks. Dalrymple and O'Bannon then heard what sounded like somebody running from the front door toward the back door, so they forced their entry into the residence by kicking down the front door.

Inside, Dalrymple and O'Bannon found Ellis's daughter, Shaina Rice, and her boyfriend near the front door. The federal officers at the rear of the trailer caught Ellis's girlfriend, Tiffany Arnold (Arnold), as she tried to run out the back door. Arnold's six-year-old son also was present in the residence. Dalrymple and O'Bannon heard someone running down the hallway toward the back door. Dalrymple pulled down a sheet that was covering the entrance to the hallway and saw Ellis moving toward the back door. Dalrymple asked Ellis to stop. As Ellis turned, he dropped a packet of methamphetamine and a .380-caliber gun. Dalrymple testified that he "put [Ellis] up against the wall" so O'Bannon could stay with Ellis while Dalrymple conducted a protective sweep of the trailer to see if others were present. O'Bannon patted down Ellis and found a concealed .22-caliber gun in a cast on Ellis's arm. O'Bannon knew Ellis by sight, as he had previously arrested him for manufacturing methamphetamine.

3

Dalrymple and O'Bannon placed Ellis under arrest. Dalrymple read Ellis his *Miranda* rights from a statement of rights card that Dalrymple carries with him. Ellis indicated that he understood his rights and that he had no questions. Ellis did not ask for an attorney and agreed to answer Dalrymple's questions. Ellis signed a written statement-of-rights form. The form reflects that Ellis and two witnesses signed it at 11:00 a.m. Ellis admitted to the officers that he owned the .380-caliber gun. He told Dalrymple that he had not manufactured methamphetamine in some time because he was having difficulty getting supplies.

The officers asked Ellis to consent to a search of the trailer. Ellis signed a consent-to-search form, which indicates that it was signed by Ellis, his daughter, and two witnesses at 11:01 a.m.[3] O'Bannon testified that the only concern Ellis had about the consent-to-search form was that he rented the trailer in someone else's name and that someone else's name was on the rental agreement. During the search of the trailer, Dalrymple testified that the officers found a 12-gauge shotgun, a jacket that contained a cell phone, Ellis's girlfriend's driver license, a .22-caliber semiautomatic pistol, and items commonly used in manufacturing methamphetamine (rubbing alcohol, hydrogen peroxide, rock salt, flour, and coffee filters).

Ellis also gave his consent to a search of his vehicle, a 2001 model KIA, though

---

[3] Dalrymple testified that the officers asked Ellis's daughter to sign the consent-to-search form because Ellis told the officers that his daughter was on the lease for the trailer.

Ellis testified that he did not recall signing the vehicle-search-consent form. The form indicates that Ellis and two witnesses signed it at 12:11 p.m. Dalrymple testified that the officers found other items used to manufacture methamphetamine in Ellis's vehicle.

## II. PROCEDURAL HISTORY

On April 24, 2003, a federal grand jury charged Ellis in a three-count indictment with (1) being a felon in possession of firearms; (2) manufacturing methamphetamine; and (3) possessing a firearm during, and in relation to, a drug trafficking crime. On November 7, 2003, the grand jury superseded the indictment and charged Ellis with two additional crimes: (1) possessing with intent to distribute methamphetamine and (2) possessing precursor materials used to manufacture methamphetamine.

Ellis pleaded not guilty and filed three motions to suppress evidence. Ellis challenged the voluntariness of his consent to search the residence where he was staying, arguing that the police forced their entry without his permission, a warrant, or exigent circumstances. Ellis also challenged the voluntariness of his consent to search his vehicle, and he challenged the admissibility of his statements, claiming that the police violated his Fifth and Sixth Amendment rights and his rights under *Miranda*. A magistrate judge, after a suppression hearing, recommended that Ellis's motions be denied. Ellis filed objections to the magistrate judge's three reports. The district court overruled Ellis's objections and adopted the magistrate judge's findings. At trial, a jury convicted Ellis of all charges. The district court sentenced him to 51 concurrent months imprisonment on the felon-in-possession and drug charges to be followed by 60

5

consecutive months of imprisonment for the use of a firearm during and in relation to a drug crime.

### III. ANALYSIS

#### A. Standard of Review

In reviewing a motion to suppress evidence, we review the district court's factual findings for clear error and legal determinations *de novo*. *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000). When a district court has denied a motion to suppress, we consider the evidence in the light most favorable to the government. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*). We will overturn the district court's factual findings only if we have the "definite and firm conviction that a mistake has been committed." *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999).

#### B. Probable Cause

Ellis claims that the officers used the arrest warrant as a pretext to entering the Lily Road address. Because the address listed on the arrest warrant was not the Lily Road address, Ellis says that the officers did not have probable cause that they would find Ellis inside the trailer.[4] The government responds that the officers did have probable cause that

---

[4] Ellis did not raise the issue of probable cause below. In his motions to suppress, Ellis challenged the voluntariness of his consents to search the trailer and the vehicle. In his objections to the magistrate judge's reports and recommendations, Ellis primarily relied on his claim that the officers violated 18 U.S.C. § 3109 by failing to knock and announce themselves before entering the trailer. Although Ellis could be deemed to have waived his right to argue this issue on appeal, *see White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) ("This court will not decide issues or claims not litigated before the district court."), in the interest of a panoptic analysis, we address the

they would find Ellis inside the trailer because the Kentucky Department of Public Safety received a complaint that Ellis was at the Lily Road address and a vehicle registered to someone with the last name of Ellis was parked at that address.

The government relies on *Payton v. New York*, 445 U.S. 573 (1980), for its position that the officers' entry into the trailer was constitutionally permissible. In *Payton*, the Supreme Court held that, absent consent or exigent circumstances, law enforcement officers cannot enter a defendant's home to arrest him without an arrest warrant and reason to believe that the defendant was home. Specifically, the Supreme Court stated that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id*. at 603.

The defendant in *Payton* was arrested in his own home. Here, however, it is noteworthy that the trailer on Lily Road was not Ellis's home. Ellis explicitly stated in his objections to the magistrate judge's report and recommendation that "[i]t is undisputed that the trailer lease is in Ms. Rice's name and she resided there. It was her home. Mr. Ellis [sic] home is that listed on the Grand Jury Warrant. . . . Mr. Ellis was only staying at his daughter Ms. Rice's home." It is well established that a defendant who was arrested in a third party's home and who is challenging the search of that home generally will not have standing to challenge the search. *See United States v. Buckner*,

issue of probable cause below.

7

717 F.2d 297, 299-300 (6th Cir. 1983).  A defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched.  *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).  The parties do not address the issue of standing on appeal.  It is, however, incumbent on us to determine if Ellis has standing to challenge the constitutionality of the officers' actions.  *See Harker v. Troutman*, 286 F.3d 359, 364 (6th Cir. 2002) ("Standing is a jurisdictional element and we are under a continuing obligation to verify our jurisdiction over a particular case."); *James v. Toledo Metro. Housing Auth.*, 758 F.2d 1086, 1092 (6th Cir. 1985) ("Even if no party to this appeal has raised the issue of standing, this court can and must address the issue on its own motion.").

The Supreme Court has held that overnight guests can claim a legitimate expectation of privacy in a host's home.  *See Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990).  The Supreme Court and this court have held that casual visitors or guests on a third party's premises for a commercial purpose do not have a legitimate expectation of privacy in a third party's home.  *See Minnesota v. Carter*, 525 U.S. 83, 91 (1998) (holding that defendants who were in another's apartment solely to package cocaine did not have a legitimate expectation of privacy); *United States v. Love*, 70 F.3d 116, 1995 WL 675562 **1, **4 (6th Cir. Nov. 13, 1995) (holding that defendant did not have a legitimate expectation of privacy in his mother's house because he moved out six months before the search and was not an overnight guest); *Buckner*, 717 F.2d at 300 (holding that

8

defendant did not have a legitimate expectation of privacy in his mother's apartment because he "did not live there and there are no other facts other than his relationship to the occupant of the apartment which would show that he had standing to challenge the search of his mother's apartment."). The record does not clearly establish how often Ellis stayed at his daughter's house; his daughter testified that it was one of two places where he stayed and that "[h]e spent a few nights" at the trailer. Taking this testimony into account, it seems that Ellis fits within the ambit of the overnight guest that the Supreme Court discussed in *Olson*. Given that his daughter testified that Ellis stays either at her trailer on Lily Road or at her grandfather's house, it seems appropriate to conclude that Ellis had a legitimate expectation of privacy in the trailer.

Assuming that Ellis has standing to challenge the search of the trailer, the district court properly denied the suppression motions because the officers had an arrest warrant for Ellis and reason to believe that he was inside the trailer. Ellis is correct that, if the complaint made to the Kentucky Department of Public Safety was indeed anonymous, anonymous informants generally cannot establish probable cause alone. *See Illinois v. Gates*, 462 U.S. 213, 227-28 (1983). Rather, anonymous tips require some corroboration. *See Alabama v. White*, 496 U.S. 325 (1990). Probable cause is a fluid concept and involves an examination of the totality of the circumstances; it "does not deal with hard certainties, but with probabilities." *Gates*, 462 U.S. at 231. There are scant details in the record with respect to the complaint the Kentucky Department of Public Safety received about Ellis. Dalrymple testified that he received information from the director of the

9

department of public safety that the department's dispatch center received a complaint "of Mr. Ellis staying at the residence of 1867 Lily Road and that he was engaged in the manufacturing of methamphetamine within that residence." Officers established surveillance outside the Lily Road address, but they did not observe any activity after an hour of surveillance. They did, however, find a vehicle parked in the driveway of the trailer registered to someone with the last name of Ellis. Dalrymple testified on cross-examination that he recalled that the vehicle was registered to a female with the last name of Ellis. The fact that the vehicle was registered to someone with the last name of Ellis, although it was a female, tends to corroborate the complaint that Ellis was staying at the Lily Road address. Although the record is devoid of any evidence that the officers were aware of any female relatives Ellis may have, the officers could have believed that the vehicle was registered to one of Ellis's relatives, such as a mother, sister, or wife. Although this is the only piece of evidence in the record that corroborates the information received by the Kentucky Department of Public Safety before the officers entered the trailer, it is sufficient to establish probable cause.

## C. 18 U.S.C. § 3109

Ellis next claims that the officers violated 18 U.S.C. § 3109 by failing to announce their presence and the purpose of their visit. Section 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

The statute regulates forced entries in connection with the execution of a search warrant. Nothing in the statute speaks to an arrest warrant, which is what the officers had in this case. Additionally, the statute applies to a search warrant executed under federal law. This case involves an arrest warrant pursuant to a state indictment and an arrest made by state law enforcement officers. This court has held that it need not consider claims made under 18 U.S.C. § 3109 when a case involves a state warrant executed by state law enforcement officers. *See United States v. Pinson*, 321 F.3d 556, 565 n.2 (6th Cir. 2003). *See also United States v. Gatewood*, 60 F.3d 248, 249 (6th Cir. 1995) ("[t]he statute in question regulates only federal officers, however, and has no application when 'state officers, acting totally without federal involvement, seize evidence that is later offered in a federal prosecution. . . .'") (internal citation omitted). Here, however, Dalrymple and O'Bannon were not acting totally without federal involvement. Indeed, two federal officers were at the Lily Road address at the time Dalrymple and O'Bannon entered the trailer. Accordingly, we proceed to consider whether Dalrymple and O'Bannon violated § 3109.

11

In *Wilson v. Arkansas*, 514 U.S. 927 (1995), a unanimous Supreme Court held that the Fourth Amendment prohibition on unreasonable searches and seizures includes the general rule that an officer's unannounced entry into a home, absent special circumstances, is unconstitutional. *Id.* at 930. The *Wilson* standard is similar to that required under § 3109. *See United States v. Ramirez*, 523 U.S. 65, 73 (1998). Law enforcement officers must knock and announce their presence and authority before entering a residence to execute a warrant. *Miller v. United States*, 357 U.S. 301, 309-10 (1958). Officers must wait a reasonable period of time before forcing their way into a residence. *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000). Failure to knock and announce before forcibly entering a residence, absent exigent circumstances, is unreasonable under the Fourth Amendment. *Id.* at 982. Determining whether officers complied with the knock-and-announce rule must be analyzed on a case-by-case basis. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). "The focus of the 'knock and announce' rule 'is properly not on what 'magic words' are spoken by the police,' or whether the police rang the doorbell, 'but rather on how these words and other actions of the police will be perceived by the occupant.'" *United States v. Spikes*, 158 F.3d 913, 925 (6th Cir. 1998) (quoting *United States v. One Parcel of Real Property*, 873 F.2d 7, 9 (1st Cir. 1989)).

> The amount of time officers need to wait before entering a home necessarily depends on how much time it would take for a person in the house to open the door. When the police execute a warrant in the dead of night or have some other reason to believe that a prompt response from the homeowner would be unlikely, the length of time the officers should wait increases. . . . Correspondingly, when

12

officers execute a warrant in the middle of the day or have requested admittance from the occupant face-to-face, the length of time the officers must tarry outside diminishes.

*United States v. Pinson*, 321 F.3d 558, 567 (6th Cir. 2003) (internal citation omitted).

Ellis says that there was no announcement of authority and purpose by the officers or any express or implied refusal of admittance by the occupants of the trailer. Ellis's argument, however, is belied by highly probative evidence in the record. The officers had a valid arrest warrant for Ellis. They arrived at the Lily Road address in mid-day, knocked and announced their presence two or three consecutive times, and received no response. Dalrymple testified that O'Bannon knocked on the front door three times, announced themselves as police officers after each knock, and waited a few seconds between each knock before knocking again. O'Bannon testified that he knocked "a couple times" and "yelled state police a couple times." Ellis says that this testimony establishes a "best estimate" that there was a delay of between two and nine seconds from the time of the officers' knocks to their entry. Ellis does not indicate how he reaches this conclusion, nor does the evidence in the record support such a conclusion. This aside, however, we have refused to adopt a rigid rule based on the number of seconds officers must wait between knocking and announcing and entering a home. *See Spikes*, 158 F.3d at 925; *Pinson*, 321 F.3d at 567. We also have recognized that in cases involving drug crimes, a wait of no more than fifteen seconds between announcement and entry may be sufficient because narcotics evidence is easily destroyed. *See Pinson*, 321 F.3d at 566.

When the officers heard what sounded like somebody running from the front door

13

to the back door, they forced their entry into the trailer. The officers reasonably believed

that occupants of the trailer were hiding, trying to flee, or perhaps destroying evidence.

*See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[H]eadlong flight . . . is the

consummate act of evasion."); *United States v. Pennington*, 328 F.3d 215, 221 n.3 (6th

Cir. 2003) (noting that sounds of an occupant moving away from a door is evidence that

admission to the residence was not forthcoming). Dalrymple and O'Bannon were

effectively "refused admittance" for purposes of § 3109 after they knocked and

announced their presence two or three consecutive times and received no response.

### D. *Miranda* Requirements

Ellis claims that Dalrymple gave him a defective *Miranda* warning. Ellis says that

when reading Ellis his *Miranda* rights, Dalrymple failed to state the phrase, "you have the

right to stop answering questions and assert your rights at any point after questioning has

begun." The government responds that the warnings Dalrymple gave Ellis adequately

informed Ellis of his rights.

In *Miranda*, the Supreme Court held that criminal suspects in custody may not be

interrogated until they have been advised of their rights, including the privilege against

self-incrimination and the right to counsel. *Miranda*, 384 U.S. at 478-79.

> He must be warned prior to any questioning that he has the right to remain silent,
> that anything he says can be used against him in a court of law, that he has the
> right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires. Opportunity to
> exercise these rights must be afforded to him throughout the interrogation. After
> such warnings have been give, and such opportunity afforded him, the individual
> may knowingly and intelligently waive these rights and agree to answer questions

14

or make a statement.

*Id.* at 479. Law enforcement officers are not, however, required to give warnings that precisely track *Miranda*'s language. Rather, the Supreme Court has held that there is no rigidity in the form of the warnings that are required to be given to a criminal defendant; no "talismanic incantation" is required to satisfy *Miranda*. *California v. Prysock*, 453 U.S. 355, 359 (1981). *See also Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (noting that procedural safeguards to protect a defendant's privilege against compulsory self-incrimination include *Miranda* warnings "or their equivalent.").

Dalrymple testified that he read Ellis his *Miranda* rights from a statement of rights card that he carries with him on a daily basis. Dalrymple testified that he advised Ellis as follows:

> You have the right to remain silent. Anything you say can and will be used against [you] in court. You have the right to talk to a lawyer for advice before we ask you any questions and you have th[e] right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any ask [sic] questioning, if you wish. Do you understand?

There is nothing defective about the warnings Dalrymple read Ellis. The phrase Ellis suggests that Dalrymple should have included, *i.e.*, a statement instructing Ellis that he has the right to stop answering questions at any point after questioning has begun, is not a phrase that the Supreme Court in *Miranda* suggested should be read to criminal suspects before interrogation. Ellis cites no authority for his argument, and, as discussed above, there is no rigid requirement with respect to the form of *Miranda* warnings an officer must give a suspect before custodial interrogation. Dalrymple and O'Bannon testified

15

that Ellis was read his rights before he made any statements, and it is significant that Ellis signed a statement of rights form acknowledging that he was informed of his *Miranda* rights. Additionally, Ellis is not a stranger to the criminal justice system. He has been arrested before and admittedly was aware of his rights. Ellis has failed to demonstrate a *Miranda* violation.

## IV. CONCLUSION

For the foregoing reasons, the decision of the district court is **AFFIRMED**.